(December 3, 1902.)

## STATE v. RIGGS.

[70 Pac. 947.]

INSTRUCTIONS—ERROR IN GIVING AND REFUSING TO GIVE.—It is error for the court to instruct the jury that if the defendant wrongfully and unlawfully and without the knowledge and consent of the owner, or any person, who could give such consent, but as a trespasser and wrongdoer took, led or drove away the property described in the information, not then intending to steal the same, but that thereafter while still in such wrongful possession of said property he feloniously appropriated the same to his own use, such taking and appropriation constitute upon the part of the defendant the crime of larceny, as fully and completely as though such felonious intention had existed in the defendant at the first taking of such property. Where the facts warrant it, as in this case, it is error for the court to refuse to give an instruction requested by the defendant, to wit: If the jury believes from the evidence that the defendant had no felonious intent to steal the property at the time he took it, then you must acquit, even if you believe he subsequently conceived the intent to appropriate it. Where the evidence wholly fails to show any felonious intent on the part of the accused at the time he takes possession of the property alleged to have been stolen, it is insufficient upon which to base a verdict of grand larceny.

(Syllabus by the court.)

APPEAL from District Court, Washington County.

The facts are fully stated in the opinion.

Frank Harris and A. A. Fraser, for Appellant.

The court erred in refusing to give to the jury the following instructions: "If the jury believe from the evidence that the defendant had no felonious intent to steal the property at the time he took it, then you must acquit, even if you believe he subsequently conceived the intent to appropriate it." (*State v. Hines*, 5 Idaho, 789, 51 Pac. 984; *People v. Morino*, 85 Cal. 515, 24 Pac. 892; *Martinez v. State*, 16 Tex. App. 122; *Warren v. State*, 17 Tex. App. 207.) In the case of lost property, the intent to steal must exist at the instant of the finding of said property. (*Beckham v. State*, 100 Ala. 15, 14 South. 859; McClain's Criminal Law, sec. 571; Clark's Criminal Law, page 262.) Marks or brands upon an animal are not sufficient to indicate the ownership of strayed or lost property, so that a person can be convicted of larceny of the same. (*State v. Swayze*, 11 Or. 357, 3 Pac. 574.) The taking up of lost or strayed animals is not larceny. (*Johnson v. State*, 36 Tex. 335; *Debbs v. State*, 43 Tex. 650; *Pitts v. State*, 3 Tex. App. 210; *Beckman v. State*, 100 Ala. 15, 14 South. 859; *Starck v. State*, 63 Ind. 285, 30 Am. Rep. 214; *Johnson v. State*, 73 Ala. 523; *Stuart v. People*, 73 Ill. 20; *Littlejohn v. State*, 59 Miss. 273; *Keepy v. State*, 14 Ind. 36; *Hall v. Commonwealth*, 78 Va. 678.) The evidence of possession of stolen property tends to connect defendant with the larceny, when proven, but does not establish the fact of the larceny having been committed. (McClain on Criminal Law, sec. 612; *People v. Williams*, 57 Cal. 108; *State v. Furlong*, 19 Me. 225; *Jorasco v. State*, 8 Tex. App. 540.) "In the first place, such recent possession does not, itself, prove any crime whatever. The *corpus delicti* must be otherwise established. (McClain's Criminal Law, sec. 616; *Smathers v. State*, 46 Ind. 447; *State v. Taylor*, 25 Iowa, 273.) The possession being accounted for, it was the duty of the jury to acquit. (*State v. Seymour*, 7 Idaho, 257, 61 Pac. 1033; *State v. Murquardsen*, 7 Idaho, 352, 62 Pac. 1034; *Galloway v. State*, 41 Tex. 289; *People v. Naregea*, 48 Cal. 123.)

Frank Martin, Attorney General, and J. H. Hawley, for the State.

"When the court fully and accurately instructs the jury on all the issues involved, it is not error to refuse the defendant's requests, even though he may correctly state the law." (*State v. Lyons,* 7 Idaho, 530, 64 Pac. 236; *State v. Dixon,* 7 Idaho, 518, 63 Pac. 801.) "On a charge of larceny it is not necessary to the conviction of the accused that he should, at the time of taking the property, have known, or have had reason to believe he knew, the particular person who owned it, or that he should have had the means of identifying him *instanter.*" (*Brook v. State,* 35 Ohio St. 46; *People v. McGarren,* 17 Wend. 460; *McMullen v. State,* 53 Ala. 531; *Long v. State,* 11 Fla. 295.) "The felonious and fraudulent taking of property with intent to deprive the owner thereof is larceny, even if the defendant did not intend to convert the same to his own use." (*People v. Juarez,* 28 Cal. 380.) The evidence as disclosed by the record shows a decided conflict as to the circumstances indicating the intent with which defendant took possession of the horse in question and there is ample evidence, as we view it, to warrant the jury in arriving at the conclusion that he took the horse with the intention of appropriating it to his own use, and to permanently deprive the owner of his property. If this be true, under the rulings of this court, as well as the weight of authority, the judgment should not be disturbed upon that ground. (*Simpson v. Remington,* 6 Idaho, 681, 59 Pac. 360; *Bonner v. Powell,* 7 Idaho, 104, 61 Pac. 138; *People v. Lewis,* 124 Cal. 551, 57 Pac. 470; *People v. Un Dong,* 106 Cal. 83, 39 Pac. 12; *Cox v. Northwestern Stage Co.,* 1 Idaho, 383; *Meyer v. Great W. Ins. Co.,* 104 Cal. 381, 38 Pac. 82.)

STOCKSLAGER, J.—William Riggs, the defendant, and appellant here, was accused of the crime of grand larceny. The charging part of the information follows: "The said William Riggs, on or about the fifteenth day of March, A. D. 1901, at the county of Washington, state of Idaho, one head of livestock, to wit, one bay horse, of the property of I. F. S. Diven, then and there being, feloniously did steal, take, lead, and drive away, contrary to the form of the statutes," etc. Upon this

charge a jury was impaneled, and trial had, which resulted in a verdict of guilty of grand larceny. Bills of exceptions were settled and allowed; a motion for new trial was filed, which was overruled; and from the order overruling this motion this appeal is taken.

The first six assignments of error are based upon the ground that the evidence is or was insufficient to support the verdict. An inspection of the record discloses that this is an important question in this case; hence we will quote extensively from the evidence disclosed from the transcript. The first witness for the prosecution was J. S. Edwards, who sold the horse in controversy to F. S. Diven a number of years ago. Diven was living near Vale at the time. Witness lived twenty-five miles from him. "Never noticed any change in the brand while he was in possession of Mr. Diven. Saw the horse early last spring in Mr. Riggs barn in Weiser. Mr. Riggs was not there. His wife was there, and Mr. George Pence. Mr. Diven and Walter Glenn were with me. Two years ago this spring I heard from Frank Bryant in Huntington. He asked me if I had a certain kind of a horse gone. I thought at the time it was a horse I had sold to parties in Union county. The description suited the other horse tolerably well. I knew Diven had lost his horse, and I knew the man in Union county had lost a horse. I found the Oregon horse a month or six weeks from the time that Bryant first told me that there was a horse in Idaho that suited the description of mine. Can't say how long after I found the Oregon horse before I told Mr. Diven about a horse of that description being in Idaho. These conversations occurred about a year before I came to Weiser and saw the horse. During the year I talked to Diven about the horse being in the possession of Riggs."

Prosecuting witness, Diven, testified: "Bought the horse from Edwards six or seven years ago. Missed him from the range about the 1st of August, 1899. Mr. Edwards first told me about the horse being in Weiser. Did not tell me in whose possession it was. Walter Glenn told me about the horse on many occasions. Showed me letters he had received from Mr.

Riggs. When I went to Weiser, Mr. Pence rode up in perhaps one minute after I did. He asked me if that was the brand on the horse. I asked him if he was in charge. He said, 'No'; Mrs. Riggs was in charge. Think he sent someone after her. I believe I was asked the question if I was going to take the horse. I said, if there was no objection. She said there was none, and no claim against him." Walter Glenn testified: "Had known the horse five or six years. Knew him in Malheur county. He had John Edwards' brand on him, and vented above it. Came to Weiser on the 2d of April, 1901, and found the horse here. Knows defendant Riggs. Saw him about January 15, 1901, at Steele and Adams' ranch six miles below Vale. Asked him if he knew of a horse in this county with John Edwards' brand on him and two half circles vented. Said he knew a horse of that kind over here. Said he was on island on Snake river, below the slide. He asked me if I knew the horse. I told him I did, and he asked me if there was any mark on the horse that I would remember. I told him there was nothing that I could remember. He said there was a mark on him that anybody in the world would know him. Did not tell me at the time what the mark was. The next time I saw Mr. Riggs I was delivering some horses to him. I told him I had found out about the mark on the horse. It was a wire cut on the front foot on the inside. 'Yes,' he says, 'the horse had that mark.' I asked him if the horse was still over there, and he said, 'No'; he had been moved, with some other horses, down to Brownlee's Ferry, and was in a field down there. On the 15th of January, I told him I wanted to get the horse, and he told me the horse was down on the island, below the slide. I asked him who had him. He told me that the horse was there, and I could get him, but not to mention his name, because he didn't want the parties to know it. He told me the same party that had the horse that was killed down by the railroad—there was some horses killed down the river, and this man Walker, I think he mentioned, had the horse, but I am not positive whether Walker's name was in it. Along in March Mr. Riggs called me up over the phone, and asked me

if them parties was going to take that offer for the horse. I told him, 'No; they would not take that offer'; and he said he would give twenty-five dollars for the chance of him, as he was going to send his son in law, George Pence, for some of his horses down the river, and that he would give that for the chance of him. After this the horse disappeared from Oregon. I next saw him on April 2d. There was a man riding him from the stockyard coming down to Weiser. I had told Mr. Diven what Riggs told me over the phone, and he wanted me to come and see if I could get any trace of him. I went down to Mr. Riggs' place, and looked at some horses he was going to ship, and this horse was in the barn. The door was open. Several men were present. I saw the horses carred that evening. Supposed to be the same horses. Mr. Riggs had control of and was carring these horses. I saw him there again on the morning of the 3d of April. After I saw this horse in the barn, I left Weiser on the 4 o'clock train that evening— the freight train. The horses went out on the same train Mr. Riggs did. I went to Nyssa. On the trip I had a conversation with Mr. Riggs. He asked me the reason the party would not take the offer for the horse. I told him I didn't know. He said he believed that the party that owned him thought he had something to do with getting away with him, and that he would not have anything more to do with it; that, if there was anything in it for me, he would tell me where the horse was. I asked him, and he said that Hoffman Bros., Eagle or Pine Valley, had the horse. That was after I had seen the horse here in Weiser. I never told Riggs to take care of the horse when he was on this side of the river. I wrote letters to him quite frequently. Don't think I told him in the letters to look out for the horse. When I found the horse in Riggs' barn, the door was open, and he was in plain sight. On that night, going west on the train, Mr. Riggs didn't tell me that the horse was in his possession, and that I or the owner could have him when called for. He never said he was tired of feeding him. I was not intoxicated at all when I got on the train. I don't know but what I did take two or three drinks out of the flask

before I got to Nyssa. Brownlee's Ferry, I should judge, is about ninety miles from Weiser. The slide and island in the Snake river is about four or five miles from Weiser." E. Rutherford testified: "He knew a horse known as the 'John Edwards' horse,' bearing a brand of two half circles, and vented in the same manner. Have known him about four years. He left the range in the neighborhood of Willow creek, Oregon, between the 1st of June and 1st of July, 1899."

Samuel Ross testified: "Live three miles below Weiser. Know the horse and defendant. I first saw that horse on what is known as 'Coal Pit Range,' on Monroe creek, in William Riggs' and Nuslein's possession. Saw him off and on from about August, 1900, or 1901. Saw him off and on for about six months. Was in the employ of Mr. Riggs. I used the horse under the direction of Mr. Riggs. He had the double B brand on him when I was working for Mr. Riggs. I never heard Mr. Riggs claim that he owned the horse. When I first saw the horse, the brand looked fresh. It had not healed over yet."

O. E. Pollock testified in chief: "That he heard a conversation in a saloon in Vale, Oregon, between Mr. Glenn and defendant, Riggs. It was in Wells' saloon, and witness was the barkeeper. Glenn asked Riggs if he knew anything more about the Edwards horse. Riggs said, 'Yes,' he knew where he was; that he had been shipped to the Nez Perces reservation, or something like that." This is as, he says, he remembers it. On cross-examination he said he made a bet of five dollars on the day of the preliminary examination that defendant would be bound over. Had a conversation with Mr. Riggs about the time of the preliminary examination in Weiser. In answer to the question: "Did you not, in that conversation, tell Mr. Riggs that what you heard him say about the horse was that he was down at Brownlee's Ferry?" he answered: "I think he said he had been down at Brownlee's Ferry; yes, sir. Q. Did you ever tell him in that conversation that that was what you heard him say in Wells' saloon? A. No, sir; I don't think I did. Q. Didn't you answer to that, 'Durned if I remember which now, whether Brownlee's Ferry or Old's Ferry'? A. Possibly I did.

I guess I did, too.    That was the answer I made to him at that time."

Frank Jasper testified: "Reside in Long Valley.    Knows the horse; also Mr. Riggs.    Saw the horse about the twenty-sixth day of last March.    Was in Riggs' employ at the time.    About that time I had a conversation with Mr. Riggs relative to a reward having been offered for the horse.    He said he had written a letter to Walter Glenn in regard to the horse.    Said to Glenn he knew where the horse was, and would get him for twenty-five dollars.    I was riding the horse at the time by direction of Riggs.    I think he said he would get the horse for twenty-five dollars, or keep the horse and give twenty-five dollars.    Rode the horse on April 2d.    Took him down to Mr. Riggs' barn."    Afterward, on cross-examination, he said: "Mr. Riggs never claimed to own the horse.    Never gave me any instruction in regard to selling the horse.    I had told parties the horse was not for sale; that Mr. Riggs had told me he belonged to a man over on Willow creek by the name of Edwards.    He told me this between the 7th of March and the 2d of April.    I told Riggs that I thought the horse had Edwards' brand on him."

James Baisley testified: "Was in the employ of defendant in 1900.    Commenced April 12th, and worked about two months.    Was riding all the time, helping him brand.    Have known the horse four years.    Saw him while working for Riggs.    Never at any time helped change the brand.    When I first saw him, the BB brand was on him.    Never helped George Pence change the brand.    Somewhat acquainted with George B. York."

And here follows evidence from the witness showing that he had signed an affidavit and given to York, but says he was drunk at the time.    He expressed it as "drunk as a dog."    He contradicts the statement in the affidavit in his evidence on the trial.    To say the least, it would be a serious situation for the liberties of the people to be predicated upon the evidence of witnesses of this character, and we apprehend the jury entirely ignored his evidence.    We certainly shall in reaching a conclu-

sion. The evidence of T. C. Galloway and George B. York on behalf of the prosecution goes to statements made by witness Baisley to them. This was all the evidence introduced on behalf of the prosecution, whereupon the defendant moved for a peremptory instruction to the jury to bring in a verdict of not guilty, which motion was overruled by the court.

M. C. Fuller testified on behalf of the defendant: "Knows defendant, and has known the horse since the holidays of 1899. First saw him on the feed-yard. No one had him. Was alone on the feed-yard. Did not notice any brands on him at the time. This was a couple of months before I sold horses to Riggs. He came to get them on the 4th of May. The day after I first saw him at the feed-yard, he came running by my house. I noticed a big brand on him. There was two B's on the hip. I don't think the brand had been on him over twenty-four hours. When Riggs got the horses from me, this horse was with them. He asked me if he could have that horse. I said, 'No, he is a stray.' I told him to take the horse to town. He said he would, and find out who owned him. I think he said he would shave the brand, and the next time I saw the horse the brand had been shaved. I saw two small brands that looked like half moons or half circles."

J. C. Nuslein testified: "That he was connected with defendant, buying and shipping horses, from March to September, 1901. Saw the horse frequently. Knew of Riggs telling parties the horse was not his, and he could not sell him. We used the horse. When I first saw the horse, he was on Fuller's ranch. Mr. Fuller told Riggs that if he would take the horse, and find an owner for him, he would give him ten dollars. I think Riggs said he belonged to a schoolmate of his, but am not positive. I think I heard him say he belonged to a man over in Oregon, but heard him say he belonged to a man by the name of Edwards. After we dissolved partnership, the next I knew of him a man by the name of Parker, who lived on Monroe creek, had him. Got him for his feed. I believe he told me to take care of him for Riggs. Kept him through the winter of 1900. I got possession of him in the spring, about a week be-

fore Diven got the horse from Riggs. W. T. Jasper came to my place after the horse. He claimed he represented Riggs. I objected to giving him up. Told him the horse did not belong to Riggs. He said I would get into trouble if I did not give him up. I got the horse from those parties that had him. They turned him out."

F. M. Page testified: "He worked for Nuslein and Riggs in May, 1900. Was present at Fuller's when they received some horses. Others there were Nuslein, Riggs, Frank Bryant, Jim Baisley, Mr. Fuller, and Scott Johnson. The horse was then branded with two large B's with a bar under it. Have worked with horses about twenty years; familiar with branding horses. Should say this brand had been on the horse twenty or thirty days. Riggs told me he was going to try to find the owner of the horse, and said if he could buy him, so he could sell him to me for sixty dollars, he would do it. I had told him I would give sixty dollars for him if I could get a good title. Baisley told Riggs he was going to quit work. Riggs said, 'If you are going over into Oregon, or are you going over to Vale?' Baisley said he didn't know. Riggs said, 'Well, you tell Edwards that I have a bay horse branded with a double B on the left stifle,' and that if he would sell him for a reasonable price he would buy him. This was about ten or fifteen days after he got him."

Scott Johnson testified in corroboration of the last witness as to the conversation between Riggs and Fuller. W. J. Crouse said: "He first knew the horse in May, 1900. Heard a conversation between Riggs and a Mr. Weaver at Weaver's place. Mr. Weaver wanted to buy the horse. Riggs said he couldn't sell him; that it was not his horse. He told Weaver, if he had anything for him to do, that he could make him earn his feed, he could take him and use him. Mr. Weaver wanted to know how long he could have him. Riggs replied he didn't know; it might be two days and might be three weeks until the owner could find him. He said he belonged to a man in Oregon."

Bird Lynch said: "He knew the horse. Known him about four years. Tried to trade Riggs out of the horse two years ago. Riggs told me he was not his horse; he was a stray."

William Wells testified: "That he knew the horse. Was also acquainted with Mr. Riggs. Had a conversation with Riggs on the street when he was leading the horse. Proposed to trade for him or buy him. He declined to do it. Said the horse did not belong to him. I think he said he belonged to a man by the name of Edwards, or some fellow in Oregon. Wanted me to write to him to come and get the horse. I think he said he lived at Vale."

Nelson Riggs, brother of defendant, said: "He first knew the horse in the summer of 1900. I tried to trade for this horse with defendant. He told me the horse did not belong to him; that he belonged to a man over in Oregon. I think Edwards was the name. Have heard him say several times that the horse did not belong to him."

Frank Hahn said: "He knew the horse. First saw him a year ago January or February. He was at Frank Parker's place. Parker had him there. Had conversation with the defendant. Tried to buy the horse. He said he would not sell him; that he did not own him."

Dan Hooper testified: "That he tried to buy the horse from defendant, but was informed that the horse did not belong to him. Mr. Riggs is a brother in law of mine." Frank Hartley's testimony is to the same effect.

George Pence said: "He knew of different parties trying to buy or trade for the horse, but that defendant always said he did not own the horse, and that he had heard him say he belonged to a man by the name of Edwards, in Oregon. I never helped brand the horse with the two B's, or any other brand. They were on him when I first saw him. I am a son in law of the defendant."

William Wilburn testified: "That he remembered accompanying defendant and Walter Glenn on a trip on a train from Payette to Nyssa, about April 2d last year. Heard a conversation between defendant and Glenn. Mr. Riggs said, as well as I remember it: 'That horse is down there, or some place. You can get the horse whenever you call for him.' I think Mr. Glenn was teed up a bit."

Conda Wilson testified: "He heard the conversation between Riggs and Glenn on the train. Mr. Riggs told him the horse was in his barn, and he wanted him to come and get him; that he was tired of feeding him."

S. A. Dougherty testified: "That he knew defendant and Glenn. Resides in Baker City, Oregon. In the month of February, 1901, he heard a conversation between defendant and Glenn in Ontario in regard to a BB horse. Mr. Riggs told Glenn to tell Mr. Edwards that, if he was not going to take the twenty-five dollar offer for that horse, to come and get him; that the man that had been keeping him for the use of him during the winter was done with him, and did not want to keep him any longer. Glenn replied he would tell him. This conversation was in February or March, 1901."

Myron Riggs said: "He tried to trade for the horse at one time. Defendant said the horse was not his. In the latter part of May or first of June, 1900, defendant dictated a letter, and his wife wrote it, to Mr. Edwards. I am a brother of defendant."

Jane Riggs says: "She is a sister in law of defendant. Knows the BB horse. Know of him taking steps to notify the supposed owner. He caused his wife to write a letter to Johnny Edwards concerning the horse. I was present at the time of writing the letter. It was last of May or first of June, 1900."

In rebuttal J. S. Edwards testified: "He had never received a letter from Riggs, or any of his family, notifying him that this horse was in their possession. I get my mail regularly, once or twice a week. The members of my family get the mail frequently. Whoever happens to be in town gets it."

This is a full summing up of all the evidence adduced on the trial. From it it seems that the defendant obtained the possession of the horse from Fuller, and if the witnesses, including Mr. Fuller, who have testified with reference to the facts of such possession, are to be believed, such possession was honestly acquired, and there was no felonious intent on the part of defendant. The record discloses that all the information Mr. Diven, the prosecuting witness, ever had relating to his horse

in this state, came from the defendant; not directly, but through others. It nowhere appears in the record that defendant ever claimed to be the owner of the horse, but, to the contrary, it appears from the evidence of a great number of seemingly disinterested witnesses that he always disclaimed any right to sell, trade, or control the horse. It is true he had possession of the horse a large portion of the time from the time Mr. Fuller turned him over to him until he was secured by the owner, but at all times he told his employees that the horse was a stray, and, he believed, belonged to a man by the name of Edwards in Oregon. The court gave the jury the statutory instructions covering the crime of larceny, and, in addition, gave the following instruction, numbered 11: "If the defendant wrongfully and unlawfully, and without the knowledge and consent of the owner, or any person who could give such consent, but as a trespasser and wrongdoer, took, led, or drove away the property described in the information, not then intending to steal the same, but that thereafter, while still in such wrongful possession of said property, he feloniously appropriated the same to his own use, such taking and appropriation constitute upon the part of the defendant the crime of larceny as fully and completely as though such felonious intention had existed in the defendant at the first taking of such property." An exception was taken to this instruction, and defendant requested the following instruction: "If the jury believe from the evidence that the defendant had no felonious intent to steal the property at the time he took it, then you must acquit, even if you believe he subsequently conceived the intent to appropriate it." This instruction was refused by the court. We think there was error in giving instruction 11, and also error in refusing to give the instruction requested by defendant. The principle is well settled that the felonious intent must exist at the time of the taking. (See *State v. Hines,* 5 Idaho, 789, 51 Pac. 984; *People v. Morino,* 85 Cal. 515, 24 Pac. 892.) In this case the instruction requested by defendant and referred by the court is in the same language as the request of the defendant in the case at bar, and the court say it was prejudicial error to

refuse to give the latter part of the instruction. In *Martinez v. State,* 16 Tex. App. 122, that court says: "Property that is lost, equally with other property, may be the subject of theft. To constitute theft of lost property, however, the fraudulent intent, which is the gist of the offense, must exist in the mind of the taker at the time of the taking, and in lost property the time of the taking is the time of the finding of the property. If the fraudulent intent did not exist at the time of the taking, no subsequent fraudulent intent in relation to the property will constitute theft." *Warren v. State,* 17 Tex. App. 207, holds to the same principle. In *Beckham v. State,* 100 Ala. 15, 14 South. 859, that court says: "Where defendant found a hog in a swamp at high water, and took it home, an instruction that, unless the felonious intent existed at the time of the taking, defendant was not guilty, should have been given." Clark's Criminal Law, at page 262: "In addition to the taking and removal of the property by trespass, there must be an intent to permanently deprive the owner of his property therein, and the intent must exist at the time of the taking. This is absolutely essential." (See, also, Rev. Stats., sec. 6314; *State v. Rechnitz,* 20 Mont. 488, 52 Pac. 264; McClain's Criminal Law, sec. 571.) A number of other authorities have been called to our attention bearing on this question, but, as they all have the same tendency, we deem it unnecessary to discuss the question further. We conclude that giving instruction numbered 11 by the trial court was error. It was also error to refuse to give the instruction requested by defendant above referred to, and that either error is sufficient to warrant this court in saying that the verdict of the jury should not be permitted to stand, as giving the one or refusing to give the other may, and likely did, prejudice the defendant, and mislead the jury in its deliberations.

We further believe the evidence in this case fails to show any reason why the defendant should be convicted of the crime of grand larceny, and his motion for a new trial should have been granted.

A number of other errors are assigned, but we deem it unnecessary to pass upon them in view of the conclusion we have reached relative to the facts shown by the evidence.

Judgment reversed, and cause remanded for further proceedings in harmony with this opinion.

Quarles, C. J., and Sullivan, J., concur.