572 P.2d 170

**The STATE of Idaho, Plaintiff-Respondent,**

v.

**Alan ERWIN, aka "Hap" Erwin, Defendant-Appellant.**

**No. 12167.**

Supreme Court of Idaho.

Dec. 2, 1977.

Robert M. Robson, Boise, for defendant and appellant.

Wayne L. Kidwell, Atty. Gen., P. Mark Thompson, Asst. Atty. Gen., Lynn E. Thomas, Deputy Atty. Gen., Boise, Alan J. Coffel, Pros. Atty., for Owyhee County, Homedale, for plaintiff and respondent.

BISTLINE, Justice.

The sole question presented on this appeal is whether the evidence as a matter of law, beyond a reasonable doubt, warranted a jury in finding that defendant was possessed of that requisite "felonious intent" which is an essential ingredient of the crime of larceny. We hold the evidence insufficient and reverse the judgment of conviction.

Defendant-appellant, Alan Erwin, was tried before a jury on a charge of grand larceny, under the provisions of I.C. § 18–4604(3).[1] Erwin, a rancher for all of his life, moved in December of 1973 from Gooding County to Owyhee County where he acquired a 2600 acre ranch. East of this ranch is a stretch of BLM land upon which a neighboring ranching operation, Guthrie's Rancho Idaho, had a grazing permit. On December 9, 1974, Erwin's 34-year-old son Sid drove two truckloads of heifers and calves—a total of 136 animals—to an auction at Producer's Livestock in Jerome, Idaho. The animals were auctioned on December 10, 1974, and 25 of Erwin's shipment were bought by Don Twito. At the auction three of these calves were observed to carry Rancho Idaho earmarks. Subsequently, an investigation of the earmarked cattle was undertaken by the Owyhee County Sheriff's Office. On January 27, 1975, brand inspectors went to the Twito ranch, shaved the three earmarked calves and found the "S" brand of Rancho Idaho on each of the animals.

The State's case against Erwin was based on the proposition that Erwin must have intended to take the three calves, because they were in his possession notwithstanding that they were earmarked, and the Erwins did not earmark or brand their own calves. The manager and the cow boss of Guthrie's Rancho Idaho testified to their distinctive

1. "18–4604. Grand larceny defined.—Grand larceny is larceny committed in either of the following cases:

.    .    .    .    .

"3. When the property taken is a horse, mare, gelding, cow, steer, bull, calf, mule, jack, goat, jenny, sheep, or hog, or a fox of any breed or a cross thereof, when in captivity and owned or held for the purpose of breeding or of fur production, or in the case of cattle, sheep, or hogs, the butchering and taking the meat products thereof."

branding and earmarking procedures. They also testified that, due to the superior quality of Erwin's grazing land, it was impossible to keep the Rancho Idaho cattle from straying and that Erwin frequently returned their strays or called Rancho Idaho hands to collect them. The auctioneer was called to establish the sale of the cattle in question. Four state brand inspectors were then called and testified to the importance of earmarks, the function they serve in helping cowboys on the range separate their herds and the ease with which they can be identified even at a considerable distance.

Finally, Deputy Brand Inspector Joe Bennett testified that on the day of the sale, " . . . I run onto Mr. Erwin standing by the desk and I asked him what he could tell me about the earmarked calves and his calves and he said that him and Rancho Idaho had got mixed and the cattle had been sorted and everything was all right." This testimony was corroborated by Kenneth Bartholomew, the district brand inspector on duty in the sales ring, who claimed he asked Bennett: "Joe, what is the earmarked cattle in Hap Erwin's" and was assured by Bennett: "I talked to Hap, they are all right." Erwin, the State maintains pointedly, did not do anything himself to check out these animals once informed of the problem.

Appellant-defendant Erwin's testimony placed this incident in a larger context. When he bought the ranch, Erwin was unaware of the problem of missing fence along his eastern boundary. Consequently, during the entire first year of operation, Rancho Idaho cattle grazing on the BLM land were constantly coming onto Erwin's property because of its water supply and its rich alfalfa. On four separate occasions from April up to and including the day in question, the Erwins separated out their neighbor's cattle that had strayed into their herd and either called Rancho Idaho or themselves transported the strays back. On each occasion, between 25 and 75 cattle were returned to Rancho Idaho. There is no hint of animosity in all this. Erwin testified that it was his own fault for not having noticed the missing fence, that it was impossible for Rancho Idaho to prevent its cattle from coming after Erwin's green alfalfa, and that it was not really costing him any money.

The December 8–9, 1974, sorting out, loading and transporting process—i. e., the "taking" and "asportation"—is narrated as follows: The Erwins explained that they began by separating the cows from the calves. Next they found the cows which belonged to other ranches—those which did not bear their own "Anchor D" and "EX" brands—corralled them, and allowed them to nuzzle the calves through the fence in a "mothering up" method of pairing off the wet cows with their own calves. These paired cows and calves were then transported back to Rancho Idaho or to whatever other ranch they might have strayed from. Next, they separated what they presumed were their own remaining calves into three categories: those too young to be separated from their mothers (these are mothered up in the way described above and are then sent out to pasture); those old enough to be weaned (these are kept back by the ranch house); and those which are heavy enough to be marketable. A final check of these cattle is performed during the loading process when the animals are inspected for health and for coloration and breed as a further control in eliminating neighbor's cattle in case a neighbor's calf had strayed from its mother or had not mothered up. In short, the Erwins claim they sort cattle by looking for breed and for pairing behavior, not for earmarks.

The result of this is not perfection when 136 calves are culled out of a herd in excess of 500 head of cattle, more than 10% of which are strays, and when the loading is done after nightfall. The Erwins testified that they have no desire to make extra work for themselves or for the brand inspectors, but that sometimes stray cattle get sent to market. (The inspectors agreed it is a not infrequent occurrence.)

Finally, Erwin testified that he did not arrive at the auction lot until after the sale was completed. His conversation with Inspector Bennett took place late that afternoon when Erwin came to pick up his check. According to Erwin, the conversation went as follows:

" . . . he asked me if I had earmarked any of them calves. I said, 'Hell, I don't know, I don't know what goes on all the time.' Well, he said, 'You don't ordinarily earmark them.' And I said 'No, we don't but on occasions we might.' Well, he said, 'I thought maybe the kids were monkeying around because,' he said, 'There is five head of calves that has earmarks on them.' Well, I said, 'Have they got any brand on them?' And I said, 'Joe we have had Rancho calves running, Rancho cows running on us all summer and we sorted those calves as best we could but,' I said, 'I wouldn't guarantee there isn't a Rancho calf on there.' "

Erwin said that he felt no obligation to check this out himself by touring the Producer's Livestock area—comprising 10 acres with 300 stalls housing 1,800 cattle—and finding the few animals in question. Erwin maintains that he relies on the brand inspectors as his last line of protection against mistakes because he pays them "six bits a head" for the service. At the time of the above conversation, Bennett had made one inspection. As a result of the conversation, he made another. And Inspector Bartholomew had made still another in the sales ring itself. At no time did either inspector discover the "S" brand of Rancho Idaho or object to the sale.

Defendant Erwin argues that the State has not presented any direct evidence establishing a felonious intent at the time of the taking, and that the circumstantial evidence is as easily taken as manifesting an honest mistake as it is toward proving a felonious intent, for which reason the conviction cannot be sustained. We agree. *See, State v.*

*Grow,* 93 Idaho 588, 593, 468 P.2d 320, 325 (1970), where it was held that "the elements of the crime which the state 'proved' were not sufficient in law to warrant a conviction," and this Court affirmed a trial court's granting of a motion to give an advisory instruction to acquit.

The State, on the other hand, while agreeing that it presented no direct evidence to prove the charge against Erwin, contends that the facts were sufficient to give rise to an inference of a felonious intent, placing reliance on *State v. Kazda,* 545 P.2d 190 (Utah 1976), and *People v. Zaring,* 547 P.2d 232 (Colo.1976). The defendant in *Zaring* was apprehended in the possession of a still-warm recently shot, partially slaughtered, 400 pound calf tied to the tailgate of his pickup. His testimony was to the effect that he had shot the calf to put it out of its misery, believing it to have been hit by a car or attacked by a coyote, and that he was trying to drag it to the nearest ranch house to find the owner; he also admitted that he was but five days from opening a restaurant with facilities to handle meat. The defendant in *Kazda* was apprehended with two others taking copper telephone wire from poles on an outlying ranch. Kazda defended on the basis that a "Mr. Johnson" had given him a contract to remove the wires, but the "Mr. Johnson" was then identified as being, in fact, one Max Reay, who was one of the other two persons caught in the act. While we find these two cases to be of interest, we do not consider the factual pattern in either to that closely approach the case at bar so as to carry any persuasion.

Larceny is a crime of specific intent.[2] The burden of proving the requisite mental state beyond a reasonable doubt belongs to the prosecution. *State v. Riggs,* 8 Idaho 630, 70 P. 947 (1902). Recent U.S. Supreme Court decisions make it clear that any attempt to shift that burden to the defendant is an error of constitutional di-

---

**2.** "18–4601. Larceny defined.—Larceny is the felonious stealing, taking, carrying, leading, or driving away the personal property of another."

"18–114. Union of act and intent.—In every crime or public offense there must exist a union, or joint operation, of an act and intent, or criminal negligence."

mensions. At most, the defendant can be made to bear the burden of producing enough evidence to justify a reasonable doubt on the issue. But once the question has been raised, it is the prosecution which must prove the requisite mental state beyond any reasonable doubt. *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). No other procedure is compatible with safeguarding the presumption of innocence, "that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law,'" *In re Winship*, 397 U.S. at 363, 90 S.Ct. at 1072.

■ While proof of *felonious* intent may be by circumstantial evidence, *State v. Gowin*, 97 Idaho 766, 554 P.2d 944 (1976), this Court has long held that

" . . . the circumstances must be consistent with the guilt of the defendant and inconsistent with his innocence, and incapable of explanation on any other reasonable hypothesis than that of guilt. "If the evidence can be reconciled either with the theory of innocence or of guilt, the law requires that the theory of innocence be adopted." *State v. Marcoe*, 33 Idaho 284, 286, 193 P. 80, 80 (1920).

*And see, State v. Hix*, 58 Idaho 730, 741–42, 78 P.2d 1003 (1938). *See also, People v. Calise,* 179 Colo. 162, 498 P.2d 1154 (Colo., en banc, 1972), where that court stated the identical principle this Court had set forth in *Marcoe* over fifty years earlier.

■ In this case, the State's presentation of evidence was insufficient to establish Erwin's intent at the time of the taking in Owyhee County, or to rebut his assertion that his shipment of the three stray Rancho Idaho cattle to auction was anything other than an honest mistake. The State maintains, nonetheless, that the question of intent is one for the jury, and that the evidence it did present was sufficient to sustain a jury verdict of conviction. A summary of the State's argument is presented in its brief as follows:

"The aforegoing excerpts from the transcript show that Appellant admitted that he personally took part in deciding which cattle were to be sold. He then sold them and they were later shown to have belonged to someone else. *The State maintains this is all that is necessary* to give rise to an inference that the requisite intent to appropriate existed at the time of the initial taking." (Emphasis added.)

Such is not the law in Idaho.

Under the provisions of I.C. § 19–2803, upon an appeal from a final judgment, and a reporter's transcript of the evidence being furnished, and there being also the requisite specification of errors in appellant's brief, it becomes our obligation to consider and determine whether the verdict is supported by the evidence.

■ In making our review we are required to give full consideration to the right of the jury to determine the credibility of witnesses, the weight to be afforded evidence, as well as the right to draw all justifiable inferences from the evidence before them. But, at the same time, judicial review requires that we peruse that evidence to determine whether a reasonable mind would conclude that the defendant's guilt as to each material element of the offense was proven beyond a reasonable doubt. Here our concern is with the element of felonious intent, and if the evidence is such that reasonable jurors must necessarily have a reasonable doubt as to the proof of that element, we can not allow the verdict to stand. This has come to be known as the "substantial evidence rule," *United States v. Ortiz*, 445 F.2d 1100 (10th Cir. 1971), cert. denied, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971); *Lewis v. United States*, 420 F.2d 1089 (10th Cir. 1970); *Curley v. United States*, 81 U.S.App. D.C. 389, 160 F.2d 229 (1947), cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), and was announced by this Court years ago:

"It takes more than mere suspicion to send a man to prison, for a felony in Idaho—there must be *substantial evi-*

dence, either direct and positive, or circumstantial. Circumstantial evidence must be not only consistent and compatible with the guilt of an accused, but it must also be inconsistent with any reasonable theory of his innocence." (Emphasis added.) *State v. Wilson*, 62 Idaho 282, 284, 111 P.2d 868, 868 (1941).

We observe that while defendant-appellant did make a motion for a directed verdict of acquittal at the close of the State's case, which was denied, defendant apparently overlooked making the same motion at the close of all the evidence, and thereby denied the trial court the opportunity to pass upon the sufficiency of the evidence in view of the testimony brought into the case by the defendant. Nor did defendant move for an advisory instruction to acquit under I.C. § 19–2123.

The evidence does not sustain the verdict, and accordingly the judgment of conviction is reversed.

McFADDEN, C. J., and BAKES, J., concur.

SHEPARD, Justice, dissenting:

I am disturbed by the action of the majority in this case which in effect is a disagreement with the jury's view of the evidence. From time immemorial, juries have been instructed that they are the sole arbiters of the facts and that it is a jury function to assign credibility and belief to the testimony of any witness. While the defendant in this case offered explanations and excuses for his possession and ultimate sale of another's property, the jury obviously did not accept that testimony as being meritorious. However, the majority does assign merit to that testimony and on that basis alone reverses.

In Idaho the necessary element of intent can be inferred from circumstances. *State v. Gowin*, 97 Idaho 766, 554 P.2d 944 (1976). *See also State v. Smith*, 48 Idaho 558, 283 P. 529 (1929); *U. S. v. Gainey*, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965); *State v. Marren*, 17 Idaho 766, 107 P. 993 (1910).

It is also clear that in Idaho circumstantial evidence is sufficient to support a conviction. *State v. Ferris*, 48 Idaho 439, 282 P. 489 (1929); *State v. Marren, supra*. As stated in *State v. McLennan*, 40 Idaho 286, 231 P. 718 (1925), circumstantial evidence is often the only means of establishing guilt and such evidence alone will support a conviction.

Here, while admittedly the prosecution's case was not overwhelming, nevertheless the evidence shows that Erwin had possession of the three calves on his ranch, he ordered them taken and sold, he was present at their sale, and he accepted the proceeds. Although Erwin was not in the habit of earmarking his calves, the three calves in question were earmarked and the brand inspectors at the sale noticed the earmarks and called them to Erwin's attention.

The jury was correctly instructed that if they found two interpretations of the evidence, each reasonable and one pointing to Erwin's guilt and the other to innocence, they should choose the interpretation supporting innocence. I can only conclude that the jury here found no reasonable interpretation of the circumstantial evidence which supported the view of Erwin's innocence.

As stated in *Dodge v. People*, 452 P.2d 59 (Colo.1969), "The evidence, with reasonable inferences therefrom, must be viewed in the light most favorable to the jury's verdict; * * * and, the jury having found the guilt of the accused proved beyond a reasonable doubt, this Court will neither weigh the evidence nor appraise the credibility of witnesses." *See also People v. Sanchez*, 184 Colo. 25, 518 P.2d 818 (1974); *People v. Bennett*, 183 Colo. 125, 515 P.2d 466 (1973); *State v. Hix*, 58 Idaho 730, 78 P.2d 1003 (1938).

The majority relies on *State v. Grow*, 93 Idaho 588, 468 P.2d 320 (1970), as warranting its holding in the case at bar that the proof of the elements of the crime were not sufficient in law to warrant the conviction. I suggest reliance on *Grow* is misplaced since there the trial court itself viewed the proof, determined it insufficient, so advised

the jury, and the jury entered a verdict of acquittal. In the case at bar, the converse is true. Both the trial court and the jury obviously deemed the proof sufficient and returned a verdict of guilty and a judgment of conviction.

In my judgment the majority's reliance on *State v. Wilson*, 62 Idaho 282, 111 P.2d 868 (1941), is also misplaced. That opinion chiefly demonstrates a badly split court with the majority characterizing the evidence as "chiefly the merest suspicion, not worthy to enter the classification of circumstantial evidence." On the other hand, the dissenters set forth the evidence in detail as supporting the conviction. Perhaps the diverse views of the evidence in *Wilson* is not unlike that of the Court today.

As the Court in *State v. Jesser*, 95 Idaho 43, 501 P.2d 727 (1972), noted after setting forth the requirement of proof of intent in the mind of the perpetrator:

"Because the jury returned verdicts of guilty, they are presumed to have found that when the grain in question was loaded at Sowards grainery, the appellants intended permanently to deprive Sowards of his property."

The trial court in the case at bar could have directed a verdict or given an advisory instruction for an acquittal if he believed there was insufficient evidence to support a guilty verdict. The trial court not only sent the matter to the jury without advisory instructions, but following the guilty verdict entered judgment of conviction and imposed a sentence of five years on the defendant who was a first time offender. I would affirm the judgment of conviction.

DONALDSON, J., concurs.