## HUBER v. THE STATE.

CRIMINAL LAW.—*Larceny.*—*Obtaining Chattel by Fraud.*—Where a person obtains possession of a chattel from the owner, by a fraudulent trick or contrivance, with intent to steal, though with the consent of the latter, he is guilty of larceny.

SAME.—*Instruction to Jury.*—On the trial of a defendant indicted for larceny, the court instructed the jury, that they should not convict the defendant, unless the State had proved that the defendant had stolen some part of the property described in the indictment, "that the property stolen was of some value," and, "if stolen, was the property of" the prosecuting witness, and that "the act of stealing" had been "committed in this county within two years prior to the finding of the indictment." *Held*, that the instruction is not erroneous.

SAME.—*Comments of Counsel.*—*Credibility of Witness.*—*Appearance of Defendant.*—It is not error, that the prosecuting attorney, on the trial of a criminal prosecution wherein the defendant has testified as a witness in his own behalf, in commenting on the credibility of the defendant, was allowed to refer to the appearance of the countenance of the latter while testifying, though abstractly such comments would be improper.

From the Wayne Circuit Court.

*S. A. Forkner*, for appellant.

*C. A. Buskirk*, Attorney General, and *H. U. Johnson*, Prosecuting Attorney, for the State.

NIBLACK, J.—The appellant, Joseph Huber, was indicted in the court below, jointly with Charles Miller, for grand larceny.

The charge was, that they had stolen fifty dollars, in United States treasury notes and national bank currency, from one Joseph Walters.

There was a trial by a jury, a verdict of guilty, fixing the punishment at five years in the state-prison, with a fine and disfranchisement, and judgment on the verdict, over a motion for a new trial.

The causes assigned for a new trial were:

1. Because the verdict is not sustained by the evidence;

2. Because the verdict is contrary to the evidence;

3. Because the verdict is contrary to law;

4. That the court erred in giving instructions from one to twenty; and,

5. That the court erred in permitting the prosecuting attorney to make certain remarks in regard to the countenance of the defendant being evidence of his guilt.

The only error assigned is the overruling of the motion for a new trial, which calls in question the sufficiency of the evidence to sustain the verdict, the correctness of the charges of the court, and the remarks of the prosecuting attorney.

On the trial, Joseph Walters testified on behalf of the State, in substance, as follows:

"The defendant got some money of me March 1st, 1877, in Richmond, Wayne county, Indiana. He got fifty dollars. It was my own money. I was walking in the street, running east and west, right south of the depot in Richmond, on that day, waiting for some household goods to come to the depot in a wagon. These goods I was going to ship to Iowa. They were my son-in-law's. The defendant came up to me there. He spoke to me first, and said, 'Grandpap, this is a nice city you have here.' I said, 'Yes; but I do not live here. I live in Eaton, Ohio, and am waiting here for some goods of my son-in-law's to come. I am going to ship them to Iowa. My son-in-law is moving out there.' I told him I was going to Iowa. He said he was agent of one of the most extensive clothing establishments in the United States, located in California. I think he said in San Francisco, but am not sure as to that. He also said that he was establishing agencies to sell their cloth by samples, and asked me how I would like to become an agent for him. I said, 'That is entirely out of my line of business.' He then said he had established agencies at Indianapolis, Connersville, Cambridge City, Newcastle, and other points. I told him I had no time to attend to the business. He said it would not take much time; that I could simply leave a few samples as I went through Chicago, (I told him I was going

through Chicago,) and at the places I stopped at in Iowa; that the goods were marked very low, and would recommend themselves. I still told him I did not believe I could attend to it; that I had a son-in-law who kept store in Eaton, and I would take some of his samples over there. He then said, 'I'll tell you what I'll do: You look like an honest man, and I'll do by you as I have done by other agents. If you will take some of our samples and leave them at Chicago, and show them in Iowa where you are going, I'll give you fifty dollars in advance.' He then took some large pieces from his pocket that looked like gold." (Spiel marks here handed to the witness.) "These look like the pieces he pulled out. They are of the same size, but are not quite so light as they were then. As he pulled these out, the defendant said, 'Here are five twenty-dollar gold pieces, fresh from the mint. If you will act as our agent, I will give you these, and you can give me fifty dollars in greenbacks, as I need some paper money. I have not got any greenbacks.' He said that their chief object was to introduce their goods. He said the samples were at the hotel, and asked me to go over there and see them. I told him I only had a few minutes' time and would go over, but would have to be quick, as I was expecting the wagon every minute. We went across to the Avenue House and went up stairs to a room. He led the way. When we went into the room, there was no one else there. There was a table there, and I saw lots of these samples of cloth I see here spread out on the table. They were marked. I saw this valise there, lying on the end of the table. I think this box containing envelopes was in the valise. I saw it there. I examined the samples on the table; defendant also looked at them with me. He said he thought I could make money out of it. I still said I believed I could not go into the arrangement. Then he said, 'I will also make you a present of a suit of clothes if you do. You may pick out the cloth from the samples, and, whatever you pick out, I will give you a suit

of clothes like it.' Just then the other man, Miller, came in. He said, 'I guess I am in the wrong room.' The defendant said, 'Oh, no; we like to see people here. I am just showing the old gentleman the cloth, and can show you at the same time.' Huber then asked Miller if he lived in the city. Miller said no, he lived in Iowa. Huber then said that I was going to Iowa, and Miller asked me what part of Iowa I was going to, and I said to Des Moines. Huber then told this man Miller what his proposition was, and that he wanted me to act as his agent, and had offered me fifty dollars. Miller then examined the cloth and said it was very nice. He took out his pocket-book and said he wished he had fifty dollars, but said he only had seven or eight dollars—I do not remember which he said. Huber again took out the gold and said, 'You give me fifty dollars in greenbacks, and I will give you this one hundred dollars in gold.' The other man then went on looking at the samples. I was sitting at the side of the table in a chair. The defendant was in front of me, at the end of the table, right in front of the door. The door was open, and the defendant was standing. Directly I said, 'Well, I guess I will take you up and do the best I can for you,' or, 'I guess I'll go into it,' or something of that kind. I took out my pocket-book, and counted out fifty dollars in paper money. I took this in my hand as I was sitting and reached it out toward defendant, and at the same time I reached out my right hand to him, and said, 'Here is your fifty dollars; now give me the gold.' He did not have the gold in his hand then. He had it out in his hand shortly before that, but had put it back in his pocket. I can't say just where his hands were when I said and did as I have stated above, but my impression is that it was right near the pocket where he had put the gold. I think he had put the gold in his right pocket. When I held out my left hand with the greenbacks and said, 'Now give me the gold,' and reached out my right hand, defendant took the greenbacks

and immediately stepped out of the door. As he stepped out he said, 'I'll be back in a minute.' He nearly closed the door, but did not latch it. I think he put the money in his pocket. I have never received the gold. I have never received the clothes either. I then went down stairs. Miller went right with me. He kind of followed me. I went out in front of the hotel. When I next saw the defendant, he was just turning the corner of McWhinney's pork-house. I just got a glimpse of him, and followed right after him."

On cross-examination, Walters, amongst other things, said:

"He told me, 'In addition to the fifty dollars, I will give you a suit of clothes.' I looked over the goods. He was to give me the fifty dollars for showing his samples in Iowa. He said he would pay fifty dollars in advance. When I handed him the fifty dollars, I reached it to him. I made no objection to his taking the money."

Huber testified that he won the money from Walters on what he called a lottery, in which envelopes and cards with numbers on them were used, and was corroborated in that respect by the testimony of Miller.

There was also testimony tending to show that Huber and Miller had become acquainted about the 1st of February, 1877, at Indianapolis, and had, during that month, gone over from Indianapolis to Richmond together; that they had been known in Indianapolis by names different from those under which they were respectively indicted and known in Richmond; that the names under which they were indicted were not their true names, and that Huber was not an agent for any clothing establishment, but only claimed to be, as a blind for his so-called lottery business.

It is urged on behalf of the appellant, that the evidence, even when construed most strongly for the State, did not make out a case of larceny; that it did not sufficiently appear that the money was taken without the consent of Walters.

In Bicknell's Criminal Practice, page 335, it is said, on what we regard as reliable authority, that, "In all cases where, although the possession was delivered with the consent of the owner, yet such consent was obtained by some fraudulent trick or contrivance with intent to steal, the transaction will be larceny—the taking in such cases being a constructive taking."

It is also said, "Where the defendant offered gold for bank-notes, and, bank-notes being delivered to him, went away with them, promising to return immediately with the gold, and never came back, it was left to the jury to say whether the defendant, at the time he took the notes, intended to steal them. 4 Taunt. 274; 9 C. & P. 784."

In the case of *Rex* v. *Williams*, 6 C. & P. 390, the prisoner was indicted for stealing a half-crown, two shillings and six penny pieces. "It appeared that the prisoner went to the shop of the prosecutor, and asked the prosecutor's son, who was a boy, to give him change for a half-crown. The boy gave him two shillings and six penny pieces, and the prisoner held out a half-crown, of which the boy caught hold by the edge, but never got it. The prisoner then ran away."

PARK, J., said, in summing up: "If the prisoner had only been charged with stealing the half-crown, I should have had great doubt, but he is indicted for stealing the two shillings and the copper. He pretends that he wants change for a half-crown, gets the change, and runs off; I think that is a larceny." 2 Bishop Crim. Law, secs. 815, 816 and 817, and notes to sec. 812; 2 Archb. Crim. Pr. & Pl., 8th ed., 1209; 2 Whart. Am. Crim. Law, secs. 1857 and 1858; 2 Russ. Crimes, 192.

We think there was evidence tending strongly to show that the money was obtained from Walters by Huber by a mere trick, a fraudulently prearranged scheme or contrivance, with the intention of stealing it, and that, hence, the verdict is sustained by sufficient evidence.

Although exceptions were reserved to all the instruc-

tions given on the trial, objections are only urged here to instructions known as Nos. four and seven.  No. four was as follows :

" You should not convict the defendant, unless the State proves beyond a reasonable doubt,

" First.   That the defendant stole some portion of the property described in the indictment ;

" Second.   That the property stolen was of some value ;

" Third.   That the property, if stolen, was the property of Joseph Walters ; and,

" Fourth.   That the act of stealing was committed in this county, within two years prior to the finding of the indictment."

The objection urged to this instruction is, that it assumes the money to have been stolen, in violation of the rules laid down in Smathers v. The State, 46 Ind. 447, and in Barker v. The State, 48 Ind. 163.

Construing all its parts together, as we are required to do, we do not think the instruction is obnoxious to that objection.

In the seventh instruction, the court put a hypothetical case to the jury, corresponding to the main features of Walters' testimony, and concluded by saying :

" And if the evidence convinces you beyond a reasonable doubt, that said Huber, at the time he received said money, intended to permanently deprive said Walters, without his consent, of the ownership of said money so delivered to him, said Huber would be guilty of the larceny of said money, and you should convict him."

The objections urged to the above concluding portion of this instruction are : 1st. That it assumes that certain facts were proved, which were not proved ; 2d. Granting the facts to be true, the transaction did not constitute a larceny, in the light of the authorities cited on behalf of the appellant.

We think that portion of the instruction, thus complained of, is, perhaps, more peremptory in its terms than

it might have been; but we are of the opinion, that, taking the instruction as a whole, in connection with the other instructions given on the trial, no substantial error was committed in giving it.

The prosecuting attorney, in his closing argument to the jury, said: "The evidences of guilt are stamped upon the countenance of the defendant;" to which the appellant, by his counsel, interposed an objection. To this the court replied, in the presence and hearing of the jury, "Take your objection," and an exception was reserved by the appellant.

The appellant was examined as a witness in the cause in his own behalf, and by that means the attention of the jury was necessarily directed to his personal appearance. It does not appear, from the bill of exceptions, whether the remarks of the prosecuting attorney, complained of, were made while commenting upon the appellant's testimony, or in connection with some other branch of the case. The prosecutor had the right to refer to the countenance of the defendant while testifying as a witness, as one of the tests of his credibility. Considered as an abstract proposition, aside from the defendant's appearance as a witness, these remarks would seem to transcend the limit of legitimate argument on the trial of a criminal cause; but the objection of the appellant to their utterance, so far as we are enabled to judge of what occurred on the occasion, was sustained by the court, and their impropriety thus brought to the attention of the jury. As the proceeding comes to us from the record, we can not hold that it constituted such an error of law on the trial as amounted to a sufficient cause for a new trial.

As a question of practice, resulting from the very necessity of the case, the courts have a very considerable, if not a very large, discretion as to the limits they will place on the argument, in the trial of a cause before a jury. It must clearly appear that such discretion has been improperly exercised against the party complaining,

before this court would be justified in revising the action of the court below in the exercise of such discretion.

We are unable to see that any substantial error was committed on the trial.

The judgment is affirmed, at the costs of the appellant.