JOHNSON *v.* STATE OF INDIANA.

[No. 27,939. Filed April 27, 1944.]

Marshall F. Kizer, of Plymouth, Louis Reidelbach, of Winamac, and Francis Murphy, of Lafayette, for appellant.

James A. Emmert, Attorney General, Frank Hamilton, First Assistant Attorney General, Frank E. Coughlin, Deputy Attorney General, and James Dilts, of Winamac, for appellee.

SWAIM, J.—The appellant was convicted of grand larceny on an indictment which charged that he did unlawfully and feloniously "take, steal and carry away of the personal goods and chattels of Russell A. Dilts and Clem V. Zellers," certain live stock of the value of $802.50.

The appellant has expressly waived all of the errors assigned except the overruling of his motion for a new trial. One of the grounds of said motion was that the verdict was not sustained by sufficient evidence.

The pertinent facts as shown by the evidence were as follows:

The appellant, for a number of years, had been engaged in the business of buying and selling livestock. Dilts and Zellers were partners conducting the Winamac Community Sale in the town of Winamac, Indiana. The livestock was consigned by the owners thereof to Dilts and Zellers for sale at auction. After the sale the partners deducted their commission and transmitted the balance of the sale price to the owners. Appellant had been a regular customer of the Winamac Community Sale for six or seven years prior to October 13, 1942. He attended the sale regularly every week and bought livestock at practically every sale he attended. He usually paid for his purchases with a check. The average amount of his weekly purchases at such sale was $400.00 or $500.00. About four years prior to the

time in question, he gave Dilts and Zellers a check on which they were unable to get their money and, in settlement of the same appellant and his wife deeded their home property in Lafayette to Dilts and Zellers and to the Monticello Sale Barn, to which he was also indebted. From that time to October 13, 1942, appellant brought to the sale blank checks, signed by his wife and drawn on her checking account, and, at the close of the sale, would fill in the amount of his purchases, deliver the check to Dilts and Zellers and have a truck haul away the stock purchased. Appellant did business in this same manner with sales barns at Crawfordsville, at Logansport, at North Judson and at Monticello, Indiana. He was operating on a very small amount of capital and purchased the livestock at these community sale barns for immediate resale. His method of doing business was fully known to Dilts and Zellers but they were glad to have him attend their sales and make purchases. He was described by them as a "good bidder."

At the Winamac Community Sales there was a sign posted back of the auction block, and it was also frequently announced from said block, that the terms of the sale were cash. Dilts testified, however, that they accepted checks for the accommodation of the buyer, "on representation that we received cash for them when presented to their bank."

On the day in question Johnson purchased livestock at the Winamac Community Sale amounting to $802.50, for which he filled in a check signed by his wife and handed the same to Dilts. The livestock he had purchased was then loaded on a truck and taken to the Lafayette Stock Yards for resale. Zellers, one of the two partners, helped load the livestock on the truck.

In answer to the question, "Did you at the time you delivered possession of this livestock on October 13,

1942, expect to or intend that he should return it to you?" Dilts answered, "No we thought we were going to get our cash for it. That was the representation in his check." Zellers testified that he helped load the stock purchased by appellant onto the truck and that then appellant "walked right across where we were loading, over to Mr. Dilts and paid him by check" and in answer to the question "And Dilts accepted this check in payment of this property?" Zellers answered, "That is right—that is, cash—our sign is in the barn there."

During the same week of this transaction appellant had purchased stock at three other sales barns and in each case had given checks signed by his wife and drawn on her account. On October 14th, appellant's wife learned from her husband that he had given these four checks on her account; and learned from the bank that there was not sufficient funds in her account to cover all the checks. In the meantime appellant had taken sick and his wife called the bank, on the afternoon of the 14th, to stop payment on said checks but was informed that she would have to come to the bank to sign a "stop payment" order. She signed such an order, dated October 14th, on the morning of the 15th. While this checking account was in her name and checks on it were signed by her, she knew nothing of the deposits to, or withdrawals from, said account prior to October 14th.

Dilts testified concerning this transaction that, "The title of property can't pass until it is paid for." Q. "You accepted a check didn't you, right there?" A. "We accept a check under the terms of sale. We accept check as an accommodation." Q. "Did you present it (the check) the next day to the Lafayette National Bank?" A. "No sir, sent it through the regular course of business as checks are always handled." Q. "You

have always been holding checks on these cattle 'buyers for a week or so at their solicitation, haven't you?" A. "No sir, deposited them the next day." Q. "You never have?" A. "Oh, we have in the past, yes."

While there was a statement in the testimony of Russell Dilts that "The title of the property can't pass until it is paid for" and the further statement that "ownership wasn't passed until it was paid for," we consider these as mere statements of his opinion of the law rather than statements as to his intention at the time the transaction occurred. It seems to us that the only reasonable inference which can be drawn from the evidence in this case is that Dilts and Zellers intended, when they voluntarily delivered the possession of this livestock to the appellant in exchange for the check, that the title to said livestock should also pass to the appellant. They were fully acquainted with his method of doing business. They knew that he would promptly take said livestock to the Lafayette Stock Yards or to some other purchaser for resale. They testified that they considered that such resale placed the livestock beyond their reach; that when they learned that payment on the check had been stopped they only attempted to collect the amount of the check from the appellant and his wife; and that they made no attempt to reach the livestock. From these undisputed facts we can only conclude that it was the intention of Dilts and Zellers to transfer the title as well as the possession of this livestock, to the appellant.

The State contends, however, that a charge of larceny may be supported even where the owner of property intentionally and voluntarily parts with the possession of title thereto, without expectation of its return, if the possession and the title are obtained by trick or fraud, the fraud in such case avoiding the legal effect

of the owner's consent. As authority for this contention the State cites *Domer* v. *State* (1936), 209 Ind. 403, 199 N. E. 237.

In that case this court did make a statement sustaining the State's contention, but the statement was only dictum and, we think, incorrect. The opinion cited § 1155 of Wharton's Criminal Law, Vol. 2, as supporting the statement. The title of the cited section of said text is, "Consent of owner does not bar prosecution in cases where consent is that defendant should have bare charge only, or where consent was not specific or voluntary." The section is apparently speaking of the transfer of possession only and even as to that concludes with the sentence "But if there be a free consent (no matter how fraudulently obtained), both as to the taker and to the thing taken, this is a defense to larceny." In § 1214 of the same text the author says, "A party obtaining goods from another by sale is not liable, as we shall have frequently occasion to see, to a prosecution for larceny, no matter how fraudulent may have been the pretences by which the sale was obtained."

The other authority cited for the statement in the Domer case, *supra,* was *Fleming* v. *State* (1893), 136 Ind. 149, 36 N. E. 154. In that case a man was found guilty of larceny for a transaction in which he procured a railroad ticket and some money from a ticket agent in exchange for a Confederate fifty dollar bill. The court there announced that "It is no longer in doubt in this State that larceny may exist, although possession of the alleged stolen goods is obtained with the consent of the owner, if that consent is procured by deception and with the intention not to return the same, but to appropriate the same and deprive the owner thereof and of a remedy for their loss." The court there was apparently considering that the defendant had obtained

only possession of the ticket and money by fraud. Nothing is said in the opinion concerning the transaction involving the voluntary transfer of title to the defendant. The opinion cited three cases, *Grunson* v. *State* (1883), 89 Ind. 533; *Alexander* v. *Swackhamer* (1885), 105 Ind. 81, 4 N. E. 433, 5 N. E. 908, and *March* v. *State* (1888), 117 Ind. 547, 20 N. E. 444, in support of the proposition that you may have larceny where the owner voluntarily parts with the possession of his property. None of these three cases is authority for the proposition that where the owner of personal property voluntarily delivers both the possession and the title of such property for an agreed purpose to an agreed person, the transaction can constitute larceny even though fraud may be involved in inducing the owner to part with his possession and title.

The distinction between the crime of obtaining property by false pretenses and of larceny, where possession of property is obtained by fraud, is sometimes hard to make. As said in 32 Am. Jur. p. 893, § 7:

"The character and nature of the crime depend on the intention of the parties. The intention of the owner not to part with his property when relinquishing possession is, in this class of cases, the gist and essence of the offense of larceny and the vital point on which the crime hinges and is to be determined. The correct distinction in cases of this kind seems to be that if by means of any trick, fraud, or artifice the owner of property is induced to part with the possession only, still meaning to retain the right of property, the taking by such means, where the requisite felonious intent is present at the time, will amount to larceny; whereas, if the owner parts with not only the possession of the goods but the right of property in them also, the offense of the party then will not be larceny but the crime of obtaining goods by false pretenses. Primarily, therefore, the nature of the offense in a

particular case where possession of goods or money is obtained by fraud is determinable by solution of the question whether the owner, in parting with possession, intended to part with his title also. Accordingly, one test for distinguishing between larceny and obtaining property, other than money, by false pretenses is said to be whether the offender can confer a good title on another by the sale and delivery of the property. If he can, the crime is obtaining property by false pretenses. If he cannot, the crime is larceny."

The general rule for distinguishing between larceny and obtaining property by false pretenses has been followed in many of the opinions of this court. In *Perkins* v. *State* (1879), 65 Ind. 317, it was said:

"It is doubtless true in many cases, that, where a party obtains possession of property from the owner, with his consent, by a fraudulent trick or device, with the felonious intent to deprive the owner thereof, he may be guilty of larceny. *Huber* v. *State,* 57 Ind. 341.

"But, so far as we are advised, this had never been held to be the case where the owner voluntarily parts with the possession, for the purpose and with the intention of parting with the title, without any expectation of its being returned, though he may have been induced thereto by the fraud of the person to whom the possession and title have been transferred. (Citing cases.)"

In *Williams* v. *State* (1905), 165 Ind. 472, 75 N. E. 875, this court said: "The fact that the owner intends to part with the title to the property, and not merely the possession, makes the distinction between larceny and false pretense." To the same effect see *Roberts* v. *State* (1914), 181 Ind. 520, 104 N. E. 970 and *Kramein* v. *State* (1934), 208 Ind. 154, 195 N. E. 74.

When this rule is applied to the facts of the instant case we can get but one answer. Here Dilts and Zellers

were well acquainted with the appellant. They had been dealing with him almost constantly for a period of six years. They fully understood his method of doing business. They voluntarily delivered to him the possession of the livestock, knowing that his purpose in purchasing the same was for immediate resale. We must, therefore, infer that they intended to transfer to him not only the possession of, but the title to, the property involved. We are, therefore, constrained to hold that the transaction, as shown by the evidence in this case, did not constitute larceny no matter how fraudulent the intent of the appellant may have been.

It is unnecessary to consider the other questions presented by the appellant.

The judgment is reversed with instructions to the trial court to grant the motion for a new trial.

NOTE.—Reported in 54 N. E. (2d) 273.