## STATE OF CONNECTICUT *v.* FRANCES BOYD

### APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. CR 1-26562

Argued April 7—decided July 18, 1969

*Francis J. DiScala,* of Norwalk, for the appellant (defendant).

*John T. Redway,* assistant prosecuting attorney, for the appellee (state).

JACOBS, J. This case presents issues arising out of the defendant's trial and conviction of the crime of larceny by shoplifting in violation of § 53-63 (b) of the General Statutes.

No error has been assigned in the charge to the jury. It must therefore be assumed that the jury were properly instructed on the applicable principles of law governing the crime of larceny by shoplifting and that the jury followed these principles. *Intelisano* v. *Greenwell,* 155 Conn. 436, 447, and cases cited.

The claim that the court erred in denying the defendant's motion to dismiss will not be considered, since the denial of such a motion is not properly assignable as error. *State* v. *Anderson,* 152 Conn. 196, 198; *State* v. *Smith,* 149 Conn. 487, 489; Maltbie, Conn. App. Proc. § 212.

The defendant also assigns error in the denial of the motion to set aside the verdict "because it is not supported by the evidence." "Before discussing the evidence in the case, certain principles of law necessarily involved in the decision to which we come should be stated. The question before us is not whether, upon the evidence, we would reach the

same conclusion as did the jury, but if the verdict is 'one which twelve honest men, acting fairly, intelligently and reasonably, might have rendered, we cannot set it aside. If, on the other hand, we find that it does manifest injustice, and is so palpably against the evidence as to indicate that the jury must have made some mistake in the application of legal principles, or were influenced by lack of knowledge or understanding, or by corruption, prejudice, or partiality, we will set it aside.' " *State* v. *Hayes,* 127 Conn. 543, 553.

The jury could reasonably have found from the evidence the following facts: On October 7, 1967, at about 4 p.m., the defendant, a young lady twenty-two years of age, accompanied by two young girl friends, entered Caldor's, a large retail department store in Norwalk, for the purpose of selecting merchandise from stock exposed for sale. Caldor's method of operation consists of self-service and open-rack merchandising. By prearrangement with Brenda Lee, the cashier at one of the check-out stalls, the defendant and Barbara Jean McCalla were to receive "breaks" on their selections as they passed through Miss Lee's check-out station. After having made her selections, the defendant placed the items in a basket provided for that purpose and proceeded to Brenda Lee's check-out aisle, immediately behind her friend, Barbara Jean McCalla. Miss Lee and Miss McCalla were lifelong friends. Caldor's security manager, who was stationed some twelve feet away from Brenda Lee's register, observed "that the cashier was only ringing up certain articles and pushing other articles to one side." The store management kept this particular register under surveillance because it had become suspicious of employee malpractice and was especially concerned with the problem of inventory shortage, a term applied to losses resulting from disappearance of

money or merchandise.[1] As the defendant proceeded through Brenda Lee's check-out line, the security manager and the assistant manager could plainly see that the defendant was only being charged $24 for the merchandise, the retail value of which amounted to $52.51. The security manager described the modus operandi in this way: "Well, she [the defendant] had certain articles which were to be rung up, such as a dress which was about $12.00 [and] would be rung up for about $2.00. There would be other merchandise, I don't recall the merchandise, but this is how it transpired. The articles —she [the cashier] would look at the price, not the price that was put on the ticket and some merchandise was just pushed aside and not even rung up on the register." The defendant handed the cashier her payroll check of $78.52 and received as "change" the sum of $54.52 instead of the correct amount, which would have been $26.01. After the sale had been consummated, the security manager went to the checkout point and "looked at the price tickets and looked at the spit-out tape from the register, noticed the discrepancy and then asked them both to come to the [security] office."

In the security office, the defendant prepared and signed a statement in which she said: "I came through the register run by Brenda Lee. I purchased $52.51 through the register and was only charged $24.00. I realize that see [sic] was going to give me a break because of my girl-friend. I realize that this was quite wrong, and tried to correct her. I am sorry this happened for both our sakes." Brenda Lee also signed a statement which reads as follows: "I am employee [sic] by Caldor's Inc. today. I let some girls go by with a couple of things

---

[1] "Inventory shrinkage" is the index used by merchants as a general measure for many forms of losses. See Cameron, The Booster and the Snitch, p. 11.

that wasn't payed [sic] in full. I checked out of [sic] friend to Barbara Jean named Frances Boyd. I charged her $24.00 for $52.51 dollars for merchandise. I also checked out Barbara Jean for $41.66. I charged her $14.60. I realize I was dishonest by doing this."

The defense attempted to show that the discrepancies were the result of honest clerical errors on the part of the cashier. There is no need to discuss the evidence in greater detail. "When there is evidence to support the finding of a jury, it is futile to appeal on the basis of a claim that the jury would have reached a contrary result if they had credited the testimony of one witness as against that of another. . . . 'The credibility of witnesses and the weight to be accorded to their testimony lie within the province of the jury. We cannot retry the case.'" *Tucker* v. *Halay,* 156 Conn. 633, 634. "'Evidence is to be measured by weight and not by tale.'" *Fengar* v. *Brown,* 57 Conn. 60, 65. In brief, all questions of credibility are for the jury, and for them alone.

The defendant contends that the evidence failed to establish that she had obtained control and dominion of the merchandise. In support of this claim, she insists that she never passed through the check-out station; that the articles were not concealed on her person; that the articles were still within the confines of the store premises; and that she was detained by the store personnel while still within the store premises.

Caldor's method of doing business differs from that usually employed in retail stores, where a clerk furnishes the customer with the goods requested and the latter completes the transaction by paying the price. In these cash over-the-counter sales, the de-

livery of the goods, the passing of the title and the payment of the price all occur at substantially the same time. But in the case of Caldor's operation, no executory contract is involved in the transaction. Caldor's makes cash transactions, but all such sales must be made at the cashier's counter. Thus, the system in vogue at Caldor's requires the customer to select and collect the goods he desires to purchase and to convey them to the only person who can sell them to him. It is true that customers are invited to take possession of the merchandise they intend to purchase, but, if such possession may be considered the equivalent of delivery, the delivery is conditional and is made only to permit the customers to take the goods to the cashier. Possession alone was not in these circumstances sufficient to pass title to the articles. Title did not pass until the delivery became absolute upon the payment of the price to the cashier. In other words, "[p]assing of the property and right to possession are two different things." *Dennant* v. *Skinner*, [1948] 2 K.B. 164, 172; see *Groomes* v. *United States*, 155 A.2d 73, 75 (D.C. Mun. App.); *Lasky* v. *Economy Grocery Stores*, 319 Mass. 224, 226; *Sanchez-Lopez* v. *Fedco Food Corporation*, 211 N.Y.S.2d 953, 956; *Day* v. *Grand Union Co.*, 280 App. Div. 253, 254 (N.Y.); *Loch* v. *Confair*, 361 Pa. 158, 164; *Pharmaceutical Society of Great Britain* v. *Boots Cash Chemists (Southern) Ltd.*, [1953] 1 Q.B. 401, aff'g [1952] 2 Q.B. 795; note, 163 A.L.R. 238. Thus, "[g]oods offered for sale on the shelves of a self-service store are not accepted, so as to create a contract of sale, until the goods are paid for at the cashier's counter." 77 C.J.S. 641, Sales, § 28; 1 Williston, Sales (Rev. Ed.) § 5a n.10; note, 16 Modern L. Rev. 369. In the case at bar, the contract may not be regarded as completed when the defendant placed the articles in the receptacle; on the contrary, customers are per-

mitted to have free access to what is in the shop and to look at and examine the different articles on display; then, ultimately having made the selections, they go to the check-out station, where the money passes and the transaction is completed. Caldor's did not intend to part with the title until the price was paid, and the defendant knew she was making purchases for cash which she intended to pay to the cashier.

"Shoplifting is the theft of goods displayed for sale."[2]  Comment, "Shoplifting and the Law of Arrest: The Merchant's Dilemma," 62 Yale L.J. 788; see *Elletson* v. *Dixie Home Stores*, 231 S.C. 565, 571. "The desire to apprehend and convict the shoplifter, to protect the merchant from substantial shoplifting losses, and to safeguard the innocent customer, has culminated in a recent spate of legislation in practically all of the states attempting in one way or another to achieve this result." 32 Am. Jur., Larceny, § 45 (Cum. Sup. 1969, p. 125).[3] "Commonly shoplifting has been prosecuted under the larceny statutes." Note, 90 A.L.R.2d 811. Our shoplifting statute, General Statutes § 53-63 (b), provides, inter alia, that "[a]ny person who wilfully takes possession of any goods, wares or merchandise offered or exposed for sale by any store or other mercantile establishment with the intention of converting the same to his own use, without paying the purchase price thereof" shall be subject to penalties varying on the basis of the value of the goods taken.

[2] The history of crime shows that shoplifting is an ancient, if not honorable, art, and the techniques of operation seemed to have changed little through the centuries. One of the earliest known accounts of shoplifting is recorded in 1597. See Edwards, Shoplifting and Shrinkage Protection for Stores, p. 4; Cameron, The Booster and the Snitch, p. 50.

[3] For valuable discussions on shoplifting, see the following: Symposium, [1968] Crim. L. Rev. 413; 61 Dickinson L. Rev. 255; 32 Ind. L.J. 20; 58 Mich. L. Rev. 429; 62 Yale L.J. 788.

See *State* v. *Vars,* 154 Conn. 255, 259; *State* v. *Benson,* 153 Conn. 209, 212. "Generally, the elements of the offense of shoplifting are the willful taking possession of goods offered for sale by a mercantile establishment without the knowledge or consent of the seller, with the intention of converting such goods to one's own use without having paid the purchase price thereof." 52A C.J.S. 406, Larceny, § 1 (5); see *State* v. *Morton,* 4 Conn. Cir. Ct. 681; cf. *State* v. *Liapes,* 24 Conn. Sup. 125, 1 Conn. Cir. Ct. 450; *State* v. *Zeig,* 24 Conn. Sup. 392, 1 Conn. Cir. Ct. 616.

The jury were warranted in believing that the defendant knowingly received more merchandise than that to which she was entitled and that her actions demonstrated that she intended permanently to deprive the owner of the goods without paying their purchase price. We cannot say that the defendant entered Caldor's with "the highest purpose"; *Sapp* v. *State,* 26 So. 2d 646, 648 (Fla.); on the contrary, she was conscious of her own dishonesty from the very start. Where the "recipient knows at the time he is receiving more than his due and intends to convert it to his own use, he is guilty of larceny. . . . That is the established rule of the American cases." *United States* v. *Rogers,* 289 F.2d 433, 438. The carrying of the merchandise through the checkstand constituted an asportation of the goods, since that act effectively removed them from the store's possession and control, even if only for a moment. The mere fact that the defendant was frustrated in her attempt to carry away the merchandise does not relieve her of the responsibility for her act. *People* v. *Thompson,* 158 Cal. App. 2d 320, 323. We can find no relief for the defendant unless we first usurp the powers of the trial court and thereafter reach a different conclusion. We are legally impotent to do the first and we cannot say that we may do the latter.

A further assignment of error propounded on this appeal is the ruling "permitting . . . the security guard of Caldor's to testify as to statements made by the defendant without first establishing that she was warned of her rights." See *Miranda* v. *Arizona,* 384 U.S. 436. The courts have uniformly held that the *Miranda* warnings do not apply to "non-law-enforcement officers." *People* v. *Frank,* 52 Misc. 2d 266, 268 (N.Y.). The security guard was not a peace officer, nor was he "acting under color of governmental authority." *People* v. *Santiago,* 53 Misc. 2d 264, 266 (N.Y.). No claim has been made or suggested that the nongovernment agent acted in collusion with a governmental agent. *Miranda* speaks variously of "law enforcement agencies" (p. 442); of "law enforcement officers" (p. 444); of "police interrogation procedures" (p. 457); of "police" (p. 465); and of "authorities" (p. 472). See also *Yates* v. *United States,* 384 F.2d 586, 588; *People* v. *Crabtree,* 239 Cal. App. 2d 789, 790; *State* v. *Master,* 154 N.W.2d 133, 136 (Iowa); *State* v. *Rodgers,* 251 La. 953, 958; *Schaumberg* v. *State,* 83 Nev. 372, 374; *People* v. *Parler,* 30 App. Div. 2d 681 (N.Y.); *People* v. *Williams,* 53 Misc. 2d 1086, 1089 (N.Y.). We hold that proof of statements made by the defendant to the security guard was not rendered inadmissible merely because the guard failed to give the warnings required by *Miranda.*

A final claim of error relates to the exclusion of extrajudicial statements made by Brenda Lee to a private investigator some three weeks after the arrest of the defendant. The exclusion of this offer was not erroneous. *Perry* v. *Haritos,* 100 Conn. 476, 485. Upon this record, we certainly could not say that the trial court exercised its discretion unreason-

ably. *Krooner* v. *Waterbury,* 105 Conn. 476, 482; Holden & Daly, Conn. Evidence § 97 (c) ; 31A C.J.S., Evidence, § 413.

There is no error.

In this opinion DiCenzo and Kinmonth, Js., concurred.