501 P.2d 727

STATE of Idaho, Plaintiff-Respondent,

v.

George JESSER, Defendant-Appellant.

STATE of Idaho, Plaintiff-Respondent,

v.

Tom GIBBS, Defendant-Appellant.

Nos. 10835, 10836.

Supreme Court of Idaho.

Sept. 25, 1972.

Rayborn, Rayborn, Webb & Pike, Twin Falls, for defendants-appellants.

W. Anthony Park, Atty. Gen., C. Kent Taylor, Asst. Atty. Gen., Boise, for plaintiff-respondent.

McQUADE, Chief Justice.

These consolidated appeals raise issues as to the evidence and distinctions among larceny, embezzlement and obtaining property under false pretenses. Our disposition of the issues today supersedes but retains the substance of a previous, unreported decision of this Court. Points emphasized by the parties on rehearing are elaborated.

I

At trial the State established that in April, 1969, the appellant Jesser offered by telephone to purchase barley from the complaining witness, Norman K. Sowards. Sowards accepted upon oral stipulation that Jesser would weigh his truck empty on scales at the Arco Feed & Fertilizer Company in Arco before proceeding to Sowards' granary near Howe. Then, upon filling the truck with barley, Jesser was to return to Arco Feed for a second weighing. When the quantity of grain in the truck was computed, Jesser was to pay Sowards by leaving a check for him at the weigh station.

On April 28, 1969, Jesser drove a green GMC truck[1] to Sowards' granary. Sowards' employee observed Jesser fill the truck with such a quantity of grain that when a canvas was drawn over the load prior to departing, it was "rounded up" at the middle the full length of the truck bed. Subsequently, a motorist traveling a road to Arco saw two unidentified men shoveling grain from a GMC truck, matching the description of Jesser's vehicle, into a smaller Ford pickup. The same motorist later saw the GMC truck on the scales at Arco Feed. While the GMC truck was being weighed Jesser told an Arco Feed employee, as the employee recalled at trial, "that this barley was real light barley, and that he couldn't get a load." Jesser did not mention previously transferring any of the grain to another vehicle.

On May 1, Jesser reappeared at the granary in the green GMC truck, accompanied by the appellant Gibbs. From a field one-eighth of a mile away, Sowards watched them fill the truck, again with such a quantity of grain that the load was "rounded out" under the canvas. Sowards' employee was also present and again noted the fullness of the load. When Jesser and Gibbs departed, Sowards and his employee followed in Sowards' car until they found the green GMC truck parked at a cafe in Howe. Sowards then contacted the county sheriff, drove to the Arco airport, took off in his airplane, and flew back over the highway between Arco and Howe.

From the air Sowards observed the green GMC truck leave the cafe in Howe and proceed down the highway toward Arco. Flying ahead, Sowards noticed that a truck with a red cab had parked in a gravel pit near the highway. When the green truck reached the gravel pit, it turned in and stopped parallel to the red-cabbed truck. Two unidentified men drew back the canvases on both trucks and transferred some of the grain from the green truck to the truck with the red cab. When this operation was completed the county sheriff, who had encountered the green GMC truck on the highway and had watched it pull into the gravel pit, noticed that the load of grain in the green GMC was "noticeably smaller" when it reappeared on the highway. After the truck with the red cab, a Ford pickup, re-entered the highway, the sheriff collected samples of spilled barley grain at the gravel pit and followed the two trucks into Arco. When he arrived in town the sheriff, and other law enforcement officers, located the red Ford pickup with grain in its bed, parked against a fence behind a cafe.

During this time Sowards flew back to Arco, landed his plane, and proceeded to the Arco Feed weigh station. When Jesser arrived in the green GMC truck, the sagging canvas continued to indicate a reduced load of grain. As the GMC truck was weighed, Jesser told Sowards the grain was too light to permit a fuller load. He did not disclose the previous transfer of grain to the Ford pickup.

Shortly after departing the weigh station the GMC truck was halted a mile outside town by law enforcement officials, who now found both Jesser and Gibbs inside. The two were placed under arrest and ad-

1. The GMC truck was variously described by witnesses as green, turquoise, or turquoise-green. It appears from the record that all witnesses were referring to the same GMC truck.

vised of their rights. Jesser told the officers that the grain had been transferred to avoid an illegal overload of the GMC truck. He stated that he did not reveal the transfer of grain to Sowards because he considered himself the owner of the grain and therefore free to handle it as he desired. He termed the failure to weigh and pay for the transferred grain "a mistake." Gibbs, when questioned about the April 28 incident, stated that he did not believe the grain had been weighed before the transfer.

The two trucks were taken into police custody and weighed the next day. The red Ford pickup was determined to contain approximately 3,580 pounds of grain. The State did not, in its case-in-chief, establish the specific quantity of grain transferred on April 28th. However, the State produced evidence of spilled barley where the motorist had seen two men shoveling grain from one truck to another on April 28th, confirming that at least some grain had been transferred. Sowards also testified that he received checks from Jesser only for the grain weighed in the green GMC truck each day.

Jesser and Gibbs both were charged with two counts of petit larceny,[2] arising from the events on April 28 and May 1, respectively. Following conviction in justice's court and trial *de novo* in district court, a jury of six returned verdicts of guilty as to both appellants on each count.[3] Judgments of conviction in district court were entered accordingly, and these appeals followed. Appellants' seven assignments of error challenge the sufficiency of evidence to support the convictions, attack the scope of inquiry allowed the State in cross-examining appellant Jesser, and argue that the appellants' conduct on April 28 or May 1 did not constitute larceny under the law.

## II

■ The factual narrative set out in Part I represents the evidence adduced during the State's case-in-chief. When the State rested, appellants moved unsuccessfully for directed verdicts of acquittal. Error is assigned to the district court's denial of the motions. These motions were based in part on the assertion that appellants' conduct was not larceny, a point we will discuss later. The motions also brought in question the sufficiency of the State's evidence. Before reviewing these motions particularly, it must be borne in mind that no statute authorizes a directed verdict of acquittal, although the legislature has authorized advisory instructions to this effect.[4] This Court explained in State v. McCarty:[5]

"At common law the trial judge had the same right to give a peremptory instruction in a criminal proceeding that he had in a civil action. [Authority cited.] The effect of C.S. § 8963, [now I.C. § 19–2123] is to limit this power, not to abolish it. Where there is *no evidence* on which to base a verdict of guilty, it is still the right and duty of the trial court, upon proper motion, to *direct* an acquittal. * * * Where, however, the evidence is merely *insufficient*, the court

---

2. I.C. § 18–4601 defines larceny as "the felonious stealing, taking, carrying, leading, or driving away the personal property of another." I.C. § 18–4603 divides larceny into two degrees, grand larceny and petit larceny. I.C. §§ 18–4604 and 18–4605 together define petit larceny as larceny committed when the property taken is valued at $150 or less. I.C. § 18–4607 provides that petit larceny, a misdemeanor, "is punishable by fine not exceeding $300, or by imprisonment in the county jail not exceeding six months or both."

3. Appellant Jesser was fined $150 and sentenced to a term of 10 days in the Butte County jail. Appellant Gibbs was fined $300 and sentenced to a term of 30 days in the county jail.

4. I.C. § 19–2123 provides: "If, at any time after the evidence on either side is closed, the court deems it insufficient to warrant a conviction, it must advise the jury to acquit the defendant. But the jury are not bound by the advice."

5. 47 Idaho 117, 118–119, 272 P. 695 (1928) ; *accord,* State v. Grow, 93 Idaho 588, 468 P.2d 320 (1970).

must then *advise* the jury to acquit, which advice the jury is not bound to follow." (Emphasis supplied.)

In Idaho, therefore, a motion for directed verdict of acquittal must be granted only when there is "no evidence" upon which to base a verdict of guilt. Under this rule, the directed verdict has been limited to cases involving a "total lack of evidence."[6] Where the record reveals "some" evidence upon which to base a verdict of guilt, the trial court may only, in its discretion, give an *advisory* instruction to acquit.[7]

■ Appellants maintain that their motions for directed verdicts of acquittal on Count I should have been granted because the State failed to prove that the grain transferred to the pickup on April 28 was not weighed. The State placed in evidence Gibbs' remark to law enforcement officers, that he did not believe the grain had been weighed before it was transferred. Moreover, Sowards testified that he received direct payment from Jesser only for the grain actually weighed in the green GMC truck.[8] From this evidence the jury reasonably could infer that the grain transferred on April 28 was not weighed. The motions for directed verdicts of acquittal on Count I properly were denied.

■ Appellant Gibbs further contends, in support of his motion, that the State failed to establish his participation in the transfer of grain on April 28 or May 1. With respect to the second day, the State adduced evidence that Gibbs was with Jesser in the green GMC truck when the barley was loaded at Sowards' granary and when the GMC truck was halted by law enforcement officers outside Arco. Sowards further testified that he observed two men transferring grain at the gravel

pit. Similarly, the motorist who saw the grain transfer on April 28 testified that two men were involved. After his arrest, Gibbs linked himself to the April 28th events by stating that he did not believe the grain had been weighed before it was transferred on that day. In light of this evidence, Gibbs' motion for directed verdict of acquittal properly was denied.

## III

Following disposition of the motions for directed verdicts of acquittal, appellant Jesser testified for the defense. On direct examination he recalled the details of his agreement with Sowards and restated his contention that the transfers of grain were intended simply to avoid violation of road weight restrictions. On cross-examination Jesser testified over repeated objections of defense counsel that, among other things, Gibbs drove the pickup truck into which grain was transferred on April 28 and May 1; that Gibbs was present during both transfers of grain; that on May 1 Gibbs parked the pickup and its cargo of grain behind the cafe in Arco; that he (Jesser) circled back with his load of grain to pick up Gibbs after weighing the green GMC truck at Arco Feed; and that on April 28 the amount of grain transferred without ever being weighed was about 500 pounds. This testimony was consistent with the State's existing evidence against Jesser; and it supplemented the State's case against Gibbs. On appeal both appellants argue that the district court abused its discretion in permitting the State such a broad scope of inquiry on cross-examination.

■ Despite the urgings of appellants, we do not perceive the issue as one

6. *See* State v. Powaukee, 78 Idaho 257, 300 P.2d 488 (1956); State v. Adair, 70 Idaho 486, 222 P.2d 741 (1950).

7. State v. McCallum, 77 Idaho 489, 295 P.2d 259 (1956); State v. Grow, *supra* note 5.

8. It appears that Sowards later arranged an indirect payment to himself by recovering the grain found in the two trucks on May 1 while also cashing the check received on that date. He apparently retained an amount which he estimated to represent the value of grain transferred on April 28th, and redeposited the remainder in Jesser's bank account.

of constitutional dimension. The privilege against self-incrimination [9] is deemed waived by a defendant who takes the stand unless it is expressly invoked.[10] It was not invoked by appellant Jesser in this case. Moreover, it has long been established that when the defendant testifies to certain facts on direct examination, he waives his privilege with respect to cross-examination on related details.[11] The Supreme Court of the United States has articulated no constitutional limit on cross-examination of a testifying defendant, beyond the requirement that the questions must address "matters raised" by testimony on direct examination [12] and relate to the offense charged.[13] In any event, to the extent that the inquiry incriminates only a co-defendant, the witness is powerless to invoke the privilege at all.[14]

■■ I.C. § 9–1205 places a restriction on the scope of cross-examination which we interpret to be co-extensive with the constitutional limit of "matters raised," when applied to this case. The statute authorizes cross-examination on "any facts stated in * * * direct examination or connected therewith".[15] The real issue, then, is whether the cross-examination of Jesser was proper under the statute. The phrase, "connected therewith," is an elastic device by which the legislature essentially has assisted the trial courts toward the exercise of sound judicial discretion in fashioning the bounds of cross-examination. Exercise of that discretion is not abused, nor does it create a constitutional issue, if the inquiry is addressed to the same events or events proximate in time and space to those covered on direct examination.[16] In the present case, Jesser put the details of the grain transfers in issue on direct examination by discussing the transfers and attempting to explain why they occurred. The trial court allowed the State to fix the location and identity of the participants at each occurrence, and to trace movement of the grain immediately thereafter. The scope of this inquiry does not indicate an abuse of trial court discretion.

## IV

The appellants' most fundamental argument is that, as a matter of law, their conduct did not constitute larceny. The argument appears to combine two alternative propositions: (a) the dispute between Sowards and the appellants is entirely a civil

9. Article I, section 13 of the Idaho Constitution, and the Fifth Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), protect the defendant in a criminal prosecution from being compelled to testify as a witness against himself.

10. United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560 (1927).

11. Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896).

12. Brown v. United States, 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958), reh. denied, 356 U.S. 948, 78 S.Ct. 776, 2 L.Ed.2d 822 (1958).

13. Johnson v. United States, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704 (1943), reh. denied 318 U.S. 801, 63 S.Ct. 826, 87 L.Ed. 1164 (1943).

14. See Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951);

United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931).

15. This language may be traced to C.S. § 8034, enacted by the 1888–1889 Territorial Legislature, superseding the "English rule" of relatively unrestricted cross-examination which had been embodied in Idaho law until that time. See R.S. § 6079 (compiled 1887). The limiting language of I.C. § 9–1205 has been made a rule of procedure and practice by order of this Court, March 19, 1951.

16. See e. g., State v. Mundell, 66 Idaho 297, 158 P.2d 818 (1945); State v. Hargraves, 62 Idaho 8, 107 P.2d 854 (1940); State v. Martinez, 43 Idaho 180, 250 P. 239 (1926); State v. Larkins, 5 Idaho 200, 212, 47 P. 945 (opinion on rehearing) (1897); McCormick, Law of Evidence, § 21 (1954), at 44. For a rigorous discussion of the permissible range of cross-examination, see Note, Limiting Effect of Direct Examination Upon the Scope of Cross-Examination, 37 Colum. L.Rev. 1373 (1937).

issue arising from Jesser's failure to satisfy obligations of a sales contract; (b) even if the conduct were criminal, the crime was not larceny—implying that it may have been obtaining property under false pretenses [17] or embezzlement.[18] We will discuss each proposition in turn.

■ The uncertain relationship between the civil law and criminal law concerning personal property is derived in large measure from our evolved tradition against enforcing contractual obligations through the criminal law. However, the modern reasons that underlie the rejection of criminal sanctions do not apply to the circumstances of every case involving a contract. Among those reasons are the improbability of preventing honest insolvency by threat of prosecution, the danger of discouraging healthy commercial risk-taking or of obtaining unjust convictions by hindsight, the futility of imprisoning a debtor unable to pay, and the concept that the seller or lender must select and accept his risks.[19] The present case does not submit to one of these rationales. The criminal prosecution of Jesser and Gibbs was not initiated to punish insolvency or to compel payment of a debt; neither is it an attempt to adjust the level of business risk incident to buying or selling grain. Rather, it is intended to deter and to punish actions prohibited by statute; as such, it is a proper exercise of the criminal law.

■ It remains to determine whether the State has prosecuted appellants for the correct crime—that is, whether it has selected the right "label" to designate the theft.[20] The primary distinctions among

17. I.C. § 18-3101 provides: "Every person who knowingly and designedly by any false or fraudulent representation or pretense, defrauds any other person of money, labor or property * * * is punishable in the same manner and to the same extent as for larceny of the money or the value of the property so obtained[.]"

18. I.C. § 18-2401 provides: "Embezzlement is the fraudulent appropriation of property by a person to whom it has been intrusted."

19. *See* Model Penal Code, Tent.Draft No. 1 (1953), App.C, at 115.

20. As those familiar with the criminal law know well, the fragmentation of theft offenses, inherited from the common law and embodied in our existing statutes, seriously impedes the administration of modern criminal justice. Nearly four decades ago, Professor Jerome Hall wrote: "It seems reasonable to conclude * * * (1) that the rules defining the subject-matter of larceny have become so highly involved, numerous and technical that they are extremely difficult to apply competently; (2) that results are therefore reached which are irrational and unjust; (3) that the results are not only unjust to many persons accused of larceny because others escape while they are punished, but also that the effect of this on the community and particularly upon the public sense of justice is disturbing and harmful; and (4) even when desirable conclusions are reached, they are the result of either an arbitrary refusal to apply well established precedents, or a very questionable interpretation of the general clause which is appended to the list of specifically named objects * * *." Hall, Theft, Law and Society 55-56 (1935). In his recent text, Professor Perkins emphasizes the continuing need for reform: "The judge is forced to take notice of hair-splitting distinctions between various types of wrongful appropriation which are merely the result of historical accident and contribute nothing to [solving] the social problem of protecting the property of individuals from predatory acts of others. * * * Miscarriage of justice has resulted in many a case because the prosecuting attorney made a wrong guess as to just what type of misappropriation would be shown when all the evidence was before the jury." Perkins, Criminal Law (2d Ed.1969), at 233.

Although our analysis, *infra*, concludes that a correct choice was made in the present case, the danger of injustice to the defendant or to society remains. The 1971 Legislature addressed this problem, among others, by enacting a comprehensive new penal and correctional code which reclassified and consolidated certain theft offenses. 1971 Idaho Session Laws, ch. 143, at 630, 690-695. However, the 1972 Legislature repealed the new code in its entirety, 1972 Idaho Session Laws, ch. 109, at 223, and essentially re-enacted the old code. 1972 Idaho

larceny, embezzlement and obtaining property under false pretenses have been clearly delineated in a landmark Massachusetts decision:[21]

"If a person honestly receives the possession of the goods, chattels or money of another upon any trust, express or implied, and, after receiving them, fraudulently converts them to his own use, he may be guilty of the crime of embezzlement, but cannot be of that of larceny, except as embezzlement, is by statute made larceny. If the possession of such property is obtained by fraud, and the owner of it intends to part with his title as well as his possession, the offence is that of obtaining property by false pretenses, provided the means by which they are acquired are such as, in law, are false pretenses. If the possession is fraudulently obtained, with intent on the part of the person obtaining it, at the time he receives it, to convert the same to his own use, and the person parting with it intends to part with his possession merely, and not with his title to the property, the offence is larceny."[22]

■■■ Contrasting larceny with embezzlement, it is settled in Idaho that if the defendant harbored a criminal intent to steal when first taking or obtaining possession of the property, the crime committed by subsequent conversion is larceny.[23] A number of other jurisdictions recognize overlapping crimes of embezzlement as well as larceny in such situations; but, in any event, the prosecution for larceny is proper.[24] The jury in the present case was properly instructed on the requisite intent:

"To constitute petit larceny, there must exist in the mind of the perpetrator, *at the time of the taking of the property,* the specific intent to permanently deprive the owner of his property." (Emphasis supplied.)

Because the jury returned verdicts of guilty, they are presumed to have found that when the grain in question was loaded at Sowards' granary, the appellants intended permanently to deprive Sowards of his property. Such a finding is supported by the evidence of coordination between Jesser and Gibbs in twice transferring grain from one truck to another at points of rendezvous between Howe and Arco. We conclude, upon comparing larceny with embezzlement, that the conviction of larceny was proper.

Reviewing the distinction between larceny and obtaining property under false pretenses, it appears from the record that the jury could reasonably have found that title to the property had not passed with possession and that, therefore, the crime of larceny was committed when appellants appropriated the grain. The Uniform Commercial Code, on which the jury was instructed, provides that title is deemed to pass to the buyer at the time and place at which the seller completes his performance with respect to physical delivery of the goods, *unless* the parties explicitly agree otherwise.[25] Both Sowards and Jesser testified at trial that weighing the grain and leaving the check at Arco Feed were expressly stipulated elements of the oral sales contract. The full meaning of this stipulation was for the jury to consider, weighing all the circumstances of the transaction.

Session Laws, ch. 336, at 844. Consequently, the challenge of reform in this area of the law still beckons.

21. Commonwealth v. Barry, 124 Mass. 325, 327 (1878).

22. *See also, e. g.,* State v. Taylor, 14 Utah 2d 107, 378 P.2d 352 (1963); Johnson v. State, 222 Ind. 473, 54 N.E.2d 273 (1943); Murchinson v. State, 30 Ala. App. 15, 199 So. 897 (1941); 2 Wharton's Criminal Law and Procedure (Anderson Ed. 1957), § 509, at 184.

23. *E. g.,* State v. Bassett, 86 Idaho 277, 385 P.2d 246 (1963); State v. Hopple, 83 Idaho 55, 357 P.2d 656 (1960); State v. Huskinson, 71 Idaho 82, 226 P.2d 779 (1951); State v. Riggs, 8 Idaho 630, 70 P. 947 (1902).

24. *See* the authorities collected in Annotation, 146 A.L.R. 532, at 549 and 557; 2 Wharton, *supra* note 22, § 508, at 182–183.

25. I.C. § 28-2-401(2).

"In a given case, it may be concluded that the parties intended that in the absence of a proper measurement of the goods there should be no sale. Should such an interpretation be given the contract, a court would necessarily conclude as a matter of general contract law not displaced by the Code that the circumstances making measurement of the goods impossible had the effect of nullifying the transaction."[26]

By transferring the grain to avoid weighing it, appellants prevented proper measurement and payment for the grain in accord with the agreement. Absent an enforceable contract, title could not pass.

■ This case also closely parallels the decisions holding that where the buyer in a retail store "serves himself" by taking the goods to a check-out station for payment, delivery by the seller up to that time is conditional, permitting the buyer to take the goods to the checking point. Title does not pass until delivery becomes absolute upon payment for the goods.[27] Similarly, the jury was entitled to find, from the circumstances revealing the intent of the parties in this case, that title did not pass until the grain was weighed and paid for at Arco.

Appellants seek to demonstrate that title did pass, through the testimony of Sowards in response to a vague hypothetical inquiry on recross examination. Defense counsel asked Sowards whether he would have expected Jesser to pay for the grain if it had "somehow been lost" enroute to Arco. The question failed to distinguish between fault-related loss and loss due to an unavoidable accident.[28] Sowards replied that "there would have been a settlement" and that he would have expected Jesser to pay. However, Sowards also testified on recross examination that *he*, not Jesser, sustained the actual loss from accidental spillage of about one hundred pounds of grain in transit to Arco. The jury, adequately instructed on the relationship between title and risk of loss, apparently found from the evidence that the risk of loss actually had not shifted. This finding appeals to common sense in light of the mechanics of the transaction. Until Jesser weighed the grain at Arco, neither party knew the quantity loaded at Sowards' granary. Since Jesser was required to pay only for the grain weighed, the risk of loss incident to transportation between the granary and Arco remained, as a practical matter, on Sowards. The record supports the jury's presumed finding that title did not pass and its expressed finding that appellants' conduct therefore constituted larceny.

### V

■ In their remaining assignments of error, appellants attack the general sufficiency of the evidence to support the verdicts and contend, with reference to May 1, that no crime could have been committed because the pickup truck never passed the weigh station in Arco. The elements of the crime of larceny include the taking or fraudulent obtaining[29] of personal property, and carrying that property away with the intent permanently to deprive the owner thereof.[30] We find nothing in appellants' general attack on the sufficiency of the evidence to establish a reasonable

---

26. 2 Anderson, The Uniform Commercial Code (2d Ed.1971), § 2–401:34, at 24. *See* Hufstetler v. State, 37 Ala.App. 71, 63 So.2d 730 (1953).

27. *E. g.*, State v. Boyd, 5 Conn.Cir. 648, 260 A.2d 618 (1969); Groomes v. United States, 155 A.2d 73 (D.C.Mun.App. 1959); Lasky v. Economy Grocery Stores, 319 Mass. 224, 65 N.E.2d 305, 163 A.L.R. 235 (1946).

28. The distinction is significant because if the loss were fault-related, Sowards

might be entitled to recover regardless of whether title had passed.

29. It has long been settled that fraud vitiates the consent of the victim to the taking of his property by agreement, and that, consequently, the taking is a constructive trespass upon possession sufficient for larceny if the other elements of the crime are present. *See*, e. g., Annotation, 26 A.L.R. 381.

30. *See generally*, State v. Bigley, 53 Idaho 636, 26 P.2d 375 (1933).

doubt that each of these elements was proved at trial.

■ The contention with relation to May 1 puts at issue the particular requirements of intent and of asportation. Appellants argue that they were apprehended before the grain in the pickup was transported outside the scope of movement authorized by the sales agreement. The jury apparently found that appellants already had manifested their intent not to weigh the transferred grain and were not prevented from doing so by their apprehension. The record fully supports such a finding. Moreover, as a matter of law, the asportation requirement is deemed satisfied if the intended movement of the property contrary to the rights of the owner is obviated by apprehension.[31] Each of the elements of the crime of larceny has been established. The judgments of conviction are affirmed.

DONALDSON, SHEPARD, and BAKES, JJ., and CALLISTER, District Judge, concur.

31. *E. g.*, State v. Boyd, *supra* note 27; People v. Lardner, 300 Ill. 264, 133 N.E. 375, 19 A.L.R. 721 (1921); 2 Wharton, *supra* note 22, § 480, at 133–134.