592 P.2d 836

**STATE of Idaho, Plaintiff-Respondent,**

v.

**John Wesley WARDEN,
Defendant-Appellant.**

No. 12528.

Supreme Court of Idaho.

March 5, 1979.

Rehearing Denied April 16, 1979.

Bistline, J., concurred and dissented with opinion.

Michael L. Schindele, of Derr, Derr & Schindele, Boise, for defendant-appellant.

Wayne L. Kidwell, Atty. Gen., Arthur J. Berry, Asst. Atty. Gen., Lynn E. Thomas, Deputy Atty. Gen., Boise, for plaintiff-respondent.

DONALDSON, Justice.

The state charged the defendant, John Wesley Warden, with the crime of assault with intent to murder for the alleged intentional shooting of Earl Huff with a handgun. The defendant was arrested in the late evening hours of October 24 or the early morning hours of October 25, 1976. At the preliminary hearing on November 3, 1976, the magistrate bound the defendant over to district court to stand trial for the crime charged. At the trial, the jury found the defendant guilty of the crime charged, and the judge sentenced the defendant to the State Board of Correction for a term not to exceed 14 years.

At trial the state based its case principally on the testimony of the victim, Earl Huff. It was his testimony that at approximately 11:15 p. m. on October 24, 1976, he in his capacity as a security officer for Wicks Corporation in Grangeville, Idaho observed a Dodge van parked on the company's property. From his patrol vehicle Huff noticed some movement in the back of the van. In order to determine if anyone was in the van, he shined the spotlight connected to his patrol vehicle into the van, got out of his vehicle and approached the windshield on the driver's side of the van. At that point he observed a man coming from the back of the van towards the front of the van with a gun in his hand. Within two or three seconds, despite Huff's effort to indicate that he was unarmed, the man shot Huff from inside the van, wounding him in the neck and knocking him to the ground. The man then got out of the van, walked over to where Huff was lying, looked at him, turned around, walked back to the van and drove off.

Huff was able to recognize the man well enough to describe him to the police as his assailant. Later that night the Grangeville police together with the Idaho County Sheriff's Office apprehended the defendant Warden based on Huff's description. A few days later while Huff was recovering in a Lewiston hospital, he identified the defendant's picture as that of his assailant.

The state presented evidence of the neutron activation analysis performed on the defendant's hands soon after his arrest. The results of that analysis indicated that the defendant had fired a handgun not more than two hours before the time of the analysis and that when the defendant fired the gun, he had both hands on the grip of the gun. The state also put various members of the Grangeville Police Department and the Idaho County Sheriff's Office on the stand and elicited testimony with respect to the investigation of the shooting, the arrest of the defendant, the impounding of the defendant's vehicle and the release of that vehicle.

The defendant based his case on his own account of the events leading up to and following the shooting of Huff as corroborated in various respects by his brother, Danny Warden, and the woman who was in the van when the shooting occurred. It was defendant's testimony at trial that at the time Huff drove up to the van that he and the woman were having sexual intercourse in the back of the van. He stated that he was interrupted in his activities by Huff's floodlight shining through the front of the van, at which point he arose and, with his pants around his ankles, started towards the front of the van. Defendant testified that he stooped to pick up his .38 Smith and Wesson handgun which had fallen on the floor from a cabinet in the van; he stumbled; and the gun discharged. Because of the spotlight shining into the van, he testified that he could not see beyond a certain point in the van when the gun discharged.

Defendant further testified that he then exited the van and approached the victim to offer assistance. He returned to the van and drove it out of the area and down the county road. When he returned to the scene of the shooting later, the victim was gone. He testified that he again drove away to a point about one and one half miles from the scene where he kicked out the windshield on the driver's side of the van and threw his .38 handgun into a plowed field. The police stopped him a short time later.

On appeal, defendant raises four assignments of error: (1) the evidence presented at trial was insufficient to sustain the verdict of guilty for assault with intent to murder; (2) three specific items of evidence at trial were inadmissible; (3) the trial judge erred in not granting an advisory instruction to acquit; (4) the resulting sentence of a term not to exceed fourteen years was excessive and therefore an abuse of discretion.

■ Appellant first contends that the evidence was not sufficient to sustain the guilty verdict in that it failed to establish intent to murder. We hold that on the basis of the record in this case, the evidence does sustain a conviction on the charge of assault with intent to murder.

■ The function of an appellate court is to examine the record to determine if competent and substantial evidence exists to support the verdict. *State v. Warden*, 97 Idaho 752, 554 P.2d 684 (1976). Where there is such evidence, the verdict will not be disturbed on appeal. *State v. Badger*, 96 Idaho 168, 525 P.2d 363 (1974). Further, the court is not authorized to substitute its judgment as to the credibility of the witnesses and the weight to be given their testimony by the jury. *State v. Buchanan*, 73 Idaho 365, 252 P.2d 524 (1953).

The victim, Mr. Huff, testified that he parked his Ford Courier five to six feet from the front and to the left facing the van; that he turned on the floodlight which was located on top of his Courier directing it at an angle toward the front of the van; that he got out of his side of the Ford Courier, crossed in front and between the two vehicles to the driver's side of the van, thus silhouetting himself; that as he approached the front of the van to inform anyone inside that they were on private property, a man came from the back of the van between the front seats with a gun in his right hand up by his ear. Huff stated that at that point he waved both of his hands to show that he was unarmed. But, within seconds, the man lowered the gun and shot him. The impact of the shot knocked Huff on his back. Huff testified that at that point the defendant-appellant opened the door on the right side opposite the driver's side of the van, walked out in front of the van over to within three feet of where he was lying, looked at him, pointed the gun at him, turned around, walked over to the opposite side of the van, got in and drove off.

Officer Schussler testified that when the Grangeville police later apprehended the defendant, the left front window of the defendant's van was missing. Defendant testified that after he left the scene of the shooting, he kicked out the shattered windshield. He then took his handgun and

threw it into a plowed field. The police never recovered the gun.

Officer Schussler also testified that he administered the neutron activation analysis to the defendant's hands soon after he was brought to the police station to test for gunshot residue (barium antimony). The findings as testified to by Robert Kopek, a forensic scientist with the Bureau of Alcohol, Tobacco and Firearms of the United States Treasury Department, were that the back of defendant's left thumb, the back of his left hand, the back of his right thumb and the back of his right hand contained gunshot residue in excess of seven or eight times the amount normally found on an individual's hands when that individual discharges a weapon. Further, the gunshot residue found was in excess of over one thousand times the amount normally found on a person's hands who had not fired a gun. Mr. Kopek specifically stated that the only conclusion he could reach from seeing the results of the analysis was that the defendant, at the time of the test, had in fact recently fired a handgun. Because of the high level of residue found, Kopek testified that in his opinion the defendant had fired the gun within two hours of the testing. Mr. Kopek's opinion was that the high levels of residue found on the back of defendant's hands and thumbs and the virtual lack of residue on his palms indicated without reservation that the defendant had made a two handed firing.

■ The argument that the state did not prove the defendant's specific intent to murder ignores two well settled principles. First, the jury may find specific intent to murder either from direct or circumstantial evidence. *State v. Buchanan, supra, citing State v. Minousis,* 64 Utah 206, 228 P. 574 (1924). Secondly, they may also infer such intent from the acts and conduct of the accused, the nature of the weapon used by the defendant and the manner in which it was used, taken together with all other circumstances in the case. *Id.* More specifically the jury may infer the intent to murder where the defendant has unlawfully used a deadly weapon, provided he used it in a way indicating an intention to kill. *Id. citing* 40 C.J.S. Homicide § 79, p. 944. The question of whether or not the specific intent existed in the mind of the accused is a question of fact to be submitted to and determined by the jury from all the evidence in the case, both direct and circumstantial, and the inferences to be drawn from that evidence. *Id.*

The jury heard the testimony of the victim, Mr. Huff. They heard an expert testify that the results of the neutron activation analysis indicated without reservation that the defendant had made a two handed firing. They heard testimony (some of which was conflicting) as to the events after the shooting leading to defendant's arrest. The jury saw the defendant on the stand and heard his version of the events surrounding the shooting. In our view the evidence presented and the inferences which the jury apparently drew from that evidence amply support a finding of specific intent to murder and the verdict of guilty for assault with intent to murder.

■ Appellant also argues that three specific items of evidence at trial were inadmissible. During the victim's testimony about the events surrounding this shooting, he concluded, over objection, that the bullet which struck him came through the left front window of defendant's van. Appellant bases his objection on the theory that the victim, Huff, could not make such a conclusion because he did not actually observe the bullet passing through the glass. In our view this evidence related to some of the detail surrounding the offense which assisted in explaining the nature of the crime. The victim testified that between the time he saw the man with the gun inside the van and the time he was shot, the windshield on the driver's side of the van was between him and the gun. It is rather obviously a reasonable inference that the bullet passed through the windshield of the van prior to striking the victim. It was not error for the trial court to admit this testimony.

■ The appellant further contends that the trial judge erroneously admitted the

state's exhibit 3, a photograph of the crime scene, because the photograph was taken during the daytime while the crime occurred at night. When the trial judge admitted this photograph, he noted that by virtue of the defendant's objection at that time, the jury was sufficiently informed of the ·fact that the exhibit was a daytime photograph.· Further, the victim authenticated the photograph, testifying that it was a true and accurate representation of the crime scene. The photograph did not attempt to simulate or recreate a scene. It merely illustrated the area where the crime occurred, and it was admissible for the probative value it had in that respect. *See State v. Wyman*, 97 Idaho 486, 493, 547 P.2d 531 (1976).

■ Appellant also objects to the admission of certain testimony offered by the state to rebut the testimony of defense witness, Danny Warden, who testified on cross-examination that he had not expressed any surprise to the police when they informed him of the shooting. The police officer's rebuttal testimony was as follows:

MR. ALBERS: What was said to Mr. Warden?

MR. METCALF: In words or substance by some of the officers he was asked where he had been and what he was doing and general interrogation questions about his activity. In words or substance it was brought out that Mr. Huff had been shot.

MR. ALBERS: What was his response to that?

MR. METCALF: Response directly to me by Mr. Danny Warden was, in words or substance he asked me, "Well do you think Wes is involved?" I said, "I don't know right now but it kind of looks that way." And his direct response to me was, "Oh my God, I hope not."

The prosecution elicited this rebuttal testimony in an effort to impeach the credibility of Danny Warden by his prior inconsistent statement. As a result, it was incumbent upon the prosecution to lay a proper foundation prior to introducing this impeaching rebuttal testimony in compliance with I.C.R. 43(b)(8). That rule states:

A witness may also be impeached by evidence, that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the circumstances of times, places and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. . .

Our review of the record indicates that the prosecution failed to lay a proper foundation with the witness it sought to later impeach by a prior inconsistent statement. Even so the failure to lay a proper foundation here is harmless error within the meaning of I.C.R. 52.[1] Danny Warden's prior statement was irrelevant and collateral to the material issues of the case. *See* Bell's Handbook of Evidence for the Idaho Lawyer, p. 45. Thus the trial court's admission of the police officer's rebuttal testimony did not affect any substantial rights of the defendant. *Accord, State v. Wrenn*, 99 Idaho 506, 584 P.2d 1231 (1978).

■ Appellant next contends that the trial court erred in not granting an advisory instruction to acquit pursuant to I.C. § 19–2123. It is well settled in Idaho that the granting or denying of an advisory instruction to acquit is within the discretion of the trial court. *State v. Wozniak*, 94 Idaho 312, 486 P.2d 1025 (1971). Such discretion will not be reversed on appeal unless a clear abuse of discretion is shown. *Id.* We find no abuse of discretion on the record before us.

■ Lastly, appellant contends that the resulting sentence of a term not to exceed fourteen years was excessive. The fourteen year sentence imposed on the defendant is the maximum sentence for assault to commit murder. I.C. § 18–4015. As in *State v.*

1. Rule 52. Harmless error.—Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

**26**

*Adair*, 99 Idaho 703, 587 P.2d 1238 (1978), we have carefully reviewed all the evidence pertaining to the facts and circumstances surrounding the crime and also the presentence investigation. Defendant, now forty-two years of age, was born and raised in Grangeville, Idaho. He was in the Army for two years and received an honorable discharge. He subsequently married, and at the time of the presentence report, he had seven children ranging in ages from eight to eighteen. Defendant completed ten years of school and obtained his G.E.D. in 1972. He has worked at various jobs from time to time as a mechanic, truck driver, or cook, either employed or self-employed, since 1957 up until the time of his arrest.

In the past, defendant has been charged with three misdemeanors: (1) disturbing the peace in 1956, which led to a fine of $60.50; (2) driving while intoxicated in 1970, which charge was never disposed of; and (3) in 1973, possession of marijuana with a suspended sentence and two years probation. We note in connection with the marijuana possession that the presentence report refers to a probation violation and revocation of probation in 1975. Defendant claims that the presentence report fails to take into account the fact that the conviction for possession was set aside on the stipulation of the Idaho Attorney General after his co-defendant, his brother, was successful in reversing the conviction on appeal in *State v. Warden, supra.*

Defendant's record reveals no pattern or propensity for violence or recidivism, except possibly for the use of marijuana since as of October 1976 there was a federal charge for possession of marijuana with intent to distribute pending against him. There is no indication that he has had any psychological difficulties. However, while the above facts might suggest that Warden is not a serious threat to society, we cannot overlook the fact that he was tried and convicted for a very serious and violent crime. Based on the violence involved in the commission of the crime alone, we hold that the trial judge did not abuse his discretion in

imposing upon the defendant the maximum sentence for assault with intent to murder.

Affirmed.

SHEPARD, C. J., and McFADDEN and BAKES, JJ., concur.

BISTLINE, Justice, concurring and dissenting.

I.

I agree with the majority that the prosecution failed to lay a proper foundation for the impeachment of Danny Warden. I cannot agree that this was harmless error. If there were any reason for any of the jurors to be left with a reasonable doubt as to John Warden's intent to kill Huff (where certainly it must be concluded that the events which occurred after the shooting were those which most likely could have turned the jury in either direction on the issue of intent), I do not believe it could be said beyond a reasonable doubt that the error was harmless. *State v. Smoot*, 99 Idaho 854, 590 P.2d 1001 (1978); *State v. Garcia*, 594 P.2d 146 (1979); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

A. Huff's version of the shooting in essence was that Warden saw him and aimed at him. Warden denied this, saying that he could not see at all. After the shooting, Huff said Warden came out of the van and aimed at him again, and stated that he escaped receiving a second shot by playing dead. Warden states that they conversed, and that he told Huff that he would go for help. Warden's version of the post-shooting events, if true, was totally turned against him by the impeachment of his brother's testimony. Such would have to have a most devastating effect with an otherwise undecided jury. The relevance of the impeachment testimony is established simply by the fact that the prosecution thought it important enough for presentation before finally resting its case. If it were irrelevant, there was obviously no need to offer it. It was proper impeachment but a proper foundation should have been laid. As was said in *Gayhart v.*

*Schwabe*, 80 Idaho 354, 330 P.2d 327 (1958), albeit a civil action,

> The purpose of the rule requiring foundation is to avoid unfair surprise and to afford the witness attacked, and the party calling him, an opportunity to correct his testimony or explain the contradiction. . . .

*Id.* at 360, 330 P.2d at 330. In a criminal action, where a defendant faces a 14-year sentence if convicted, there is all the more reason for strict compliance with the rule. Although the majority cites *State v. Wrenn* as authority for its harmless error disposition of this assignment of error, I see the language in the *Wrenn* opinion, both the majority and Bakes, J., specially concurring, as *requiring* that Warden be awarded a new trial free from any such error. The majority in *Wrenn*, mindful of "the limited evidence in support of [the] conviction," concluded that the irrelevant evidence there erroneously admitted resulted in "a reasonable probability that the verdict might have been different had the errors not been committed." *State v. Wrenn*, 99 Idaho 506, 511, 584 P.2d 1231, 1236 (1978).

Here, the only evidence tending to prove an intentional shooting with an intent to kill is the testimony of the victim, Huff. Huff's testimony, if not inherently incredible, is sufficient to sustain the jury's findings. Warden's primary contention attacks the credibility of Huff's testimony, bringing into sharper focus the improper impeachment of Warden's brother's testimony. That Huff was wounded by a shot, a single shot, fired from a revolver from within Warden's van and through the left (driver's side) windshield is not in dispute. Also conceded is that Warden and a woman were the sole occupants of the van, where sexual intercourse was taking place when Huff pointed his pickup head-on at the van at a distance of approximately 12 feet away. In addition to throwing his headlights directly into the van, Huff also directed the beam of a roof-mounted spotlight into the van. Warden arose and came forward from the back of the van. Facing into the glare, he picked up his gun, which discharged, or was discharged, the shot going through the windshield and striking Huff. As the majority opinion notes, this all took place "within two or three seconds."

The main thrust of Warden's argument on appeal is that under those circumstances, that which is incredible, and that which was the real issue of the trial, is Huff's claim that he saw Warden come from the back of the van with the gun held, as the majority notes, at the ready, "in his right hand up by his ear," and that Warden "lowered the gun and shot him." Although an expert for the prosecution testified that Warden had made a two-handed firing, Huff did not alter his version of being fired at by a gun held in one hand.

As the majority opinion correctly points out, Warden stated that he arose from the back of the van, with trousers down, and started forward, stooping to pick up the gun and it discharged accidentally when he stumbled. The only other witness to the incident was the van passenger—whose testimony corroborated Warden's. The testimony of Warden and the woman was contradicted by the inference to be drawn from Huff's testimony that Warden could face those lights and yet see well enough to draw down, aim, and fire off a shot within two or three seconds. Warden argues that Huff's testimony was not entitled to belief, apparently on the basis that the jurors should know from their common experience that human eyes cannot emerge from the darkness of the rear of a van, and within two or three seconds adapt to blinding lights sufficiently to see, aim at, and shoot Huff. Apparently no independent tests were made, as neither the prosecution nor the defense offered any testimony whatever to discredit or bolster Warden's testimony that he could not see.[1]

---

1. As far as the record shows neither the prosecution nor the defense offered Warden the opportunity of submitting to a polygraph test, the results of which might have been stipulated into evidence at least as corroborative evidence. See *Commonwealth v. Vitello*, 381 N.E.2d 582 (Mass. 1978); *Commonwealth v. A Juvenile*, 365 Mass. 421, 313 N.E.2d 120 (1974); *Corbett v. State*, 584 P.2d 704 (Nev. 1978); *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962).

The prosecution presented no evidence of any reason or motive which might have impelled Warden to deliberately aim at Huff and then shoot him. In fact, the State in its brief states to the contrary, that there was no provocation whatever for Warden to shoot Huff. Reduced to simplicity, the jury was asked to believe, and did, that Warden came forward, could see, and deliberately tried to murder Huff by shooting him through the windshield—all in two or three seconds.

B. The majority opinion states that the intent to murder may be *inferred* "where the defendant has unlawfully used a deadly weapon, *provided he used it in a way indicating an intention to kill.*" (Emphasis supplied.) I have no trouble with the statement, and I agree with the statement following it, that the existence of the specific intent "is a question of fact to be submitted to and determined by the jury from all the evidence in the case, both direct and circumstantial, *and the inferences to be drawn from that evidence.*" (Emphasis supplied.) Which brings us back to square one: Warden's credibility challenge to Huff's testimony that he saw Warden come from the back of the van, saw the revolver at the ready held in the right hand by the ear, saw the gun levelled at him, and was then shot, providing the jury with an inference that Warden could indeed see against the lights.

The sufficiency of the evidence is, with a proper charge of the applicable law, primarily a jury function, and within a wide field of discretion, its determination is final. Nonetheless, where the sufficiency of the evidence is challenged on an appeal, the evidence upon which the jury's determination has been made is subject to review, and an appellate court is obliged to make that review. We must, however, make that review of the evidence applying the same standards by which the jury was bound. Here we must be able to say that the evidence submitted to the jury was beyond a reasonable doubt sufficient to establish not only that Warden deliberately fired that single shot which struck Huff, but that in so doing he was possessed of an intent to kill. The real and even more narrow question is not whether Warden was possessed of an intent to kill Huff, but whether the *evidence* presented to the jury justified it in so finding beyond a reasonable doubt. Under the circumstances of this shooting, that the evidence carries that degree of persuasion is a close question, and so close, that because of the improper impeachment, I cannot in good conscience vote to affirm. The interests of justice would be better served by a new trial free of that error. At stake for Warden is a 14-year sentence, from which neither he nor society will benefit unless his guilt is established in a fair trial.

In *People v. Holt*, 25 Cal.2d 59, 89, 153 P.2d 21, 37 (1944), the court there noted, "[t]he victim of manslaughter or second degree murder is just as dead as is the victim of first degree murder." In the case now at bench, however, the victim of this shooting did not die, and the major issue presented is *whether the evidence is that sufficient beyond a reasonable doubt, that the shooting was done by Warden deliberately with the requisite intent to kill.*

Since the beginning of Idaho's history, the territorial, and, in turn, the state legislature has recognized that all homicides are not murders—that where there is no malice (which the majority opinion speaks of as the unlawful use of a deadly weapon used in a way indicating an intention to kill), the homicide may amount to the lesser crimes of voluntary or involuntary manslaughter. I.C. § 18-4006. Included in that statute's fixed standard of involuntary manslaughter is "the operation of any firearm or deadly weapon in a reckless, careless or negligent manner which produces death . . . ." I.C. § 18-4006(2). The law does not recognize the crime of attempted involuntary manslaughter, i. e., a person's attempt to recklessly, carelessly or negligently shoot

another so as to kill him. The law does recognize, however, that the same kind of conduct which would mount to involuntary homicide where the shooting victim dies, is punishable where the victim is only wounded. I.C. §§ 18–3306 and 3312 deal with the injury of a person by use of firearms where, respectively, the discharged firearm was pointed or aimed intentionally, but without malice, and where the injury was occasioned by the handling or use of the firearm in a careless, reckless or negligent manner, or without due caution and circumspection. I.C. § 18–3306 specifically provides that if the wounded person dies, absent malice on the part of the offender, the offender shall be deemed guilty of manslaughter. I.C. § 18–901 defines an assault as an attempt to do a violent injury on the person of an another, and where the injury attempted is murder, the deliberate intent to take the life of a fellow creature is the essential ingredient which must be found to exist in order to remove the conduct from the purview of I.C. §§ 18–3306 and 3312.

It is necessary that the foregoing legislatively fixed standards be understood and kept in mind when this Court conducts its careful review of the evidence to ascertain its sufficiency, judged by the requirement of proof beyond a reasonable doubt to support the judgment of conviction.

As this Court stated in *State v. Erwin*, 98 Idaho 736, 572 P.2d 170 (1977),

> In making our review we are required to give full consideration to the right of the jury to determine the credibility of witnesses, the weight to be afforded evidence, as well as the right to draw all justifiable inferences from the evidence before them. But, at the same time, judicial review requires that we peruse that evidence to determine whether a reasonable mind would conclude that the defendant's guilt as to each material element of the offense was proven beyond a reasonable doubt. Here our concern is with the element of felonious intent [here a deliberate intention to kill], and if the evidence is such that reasonable jurors must necessarily have a reasonable doubt

as to the proof of that element, we can not allow the verdict to stand. This has come to be known as the "substantial evidence rule," *United States v. Ortiz*, 445 F.2d 1100 (10th Cir. 1971), cert. denied, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971); *Lewis v. United States*, 420 F.2d 1089 (10th Cir. 1970); *Curley v. United States*, 81 U.S.App.D.C. 389, 160 F.2d 229 (1947), cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947) . . . .

*Id.* at 740, 572 P.2d at 174. With the fixed standards of the law firmly in mind, and upon a painstaking review of all of the evidence, I must conclude, that, except for the erroneous admission of the impeachment testimony, reasonable jurors necessarily should have entertained a reasonable doubt that Warden deliberately intended to take Huff's life.

Had this incident taken place in broad daylight, the testimony of Huff, if believed by a jury, might justify this Court in holding the admission of the impeachment testimony as harmless error. But it did not take place in broad daylight. I cannot but believe that jurors, acting reasonably, would entertain much doubt that Warden's eyes adapted sufficiently within two or three seconds so as to enable him to see at all, let alone observe Huff, and then carefully draw down on him from the ready position and fire. Judges and jurors are not at all unalike in their past experiences, and are entitled to, and should draw upon the same in resolving questions of fact. That which is known as a person is not to be less known as a juror and likewise with judges. A blinding light is a blinding light. Common experiences with bright lights, of which most quickly comes to mind the meeting of on-coming motor vehicles, or the direct beam of a pointed bright flashlight in a dark room, cause all of us to have formed some opinion as to the eye's inability to see against such an impediment.

Reasonable doubt is further suggested by the conflict in the prosecution's evidence. As the majority opinion notes, the prosecution's scientist testified "*without reservation* that the defendant had made a two

handed firing." Yet Huff's testimony was that he saw Warden holding the gun in his right hand, up by his ear, from which position he states that Warden drew down at him, and then was struck by the bullet. While it is true, as the majority notes, that our function "is to examine the record to determine if competent and substantial evidence exists to support the verdict," that does not justify us in totally ignoring the effect of such conflicting evidence in our review for sufficiency, especially where the introduced evidence is afflicted with the presence of crucial testimony improperly admitted.

## II

Warden challenges the imposition of a maximum (14 years) sentence as unduly harsh. Noting the violence of the crime, the majority of the Court states that Warden has not demonstrated any abuse of discretion in that sentence. If Warden stood convicted in a trial free of prejudicial error, I would not disagree. Where it is properly established that a person was deliberately shot with an intent to murder, the statutory maximum sentence for the offender ordinarily ought not to be disturbed as excessive. Here, however, Warden's attorney sought probation for his client, apparently on the basis of this being his first felony conviction, and perhaps by reason of the limited evidence and the bizarre circumstances giving rise to the shooting—the State itself conceding that there was no provocation, and establishing no motive whatever for Warden to have intended the death of Huff.

Probation was denied, and sentence imposed, apparently on the basis that Warden was not a person who could "do" a successful probation. Matters connected therewith have not been discussed in the majority opinion.

A. A close review of the record is strongly indicative that Warden's application for probation was seriously prejudiced by a strangely inaccurate presentence report. Dates are here important. The jury verdict of guilty was received and entered on December 22, 1976. Judgment of conviction was rendered and entered on January 21, 1977. A presentence investigation was ordered and is in the appeal record. It was prepared on January 12, 1977. Routine information was Warden's age, 40, his dependents, 8, and that he had been in jail, unable to make bond since his arrest. He had no prior felony charges, and misdemeanors of little consequence. He had been fined $60.50 in 1956 for disturbing the peace—intoxication—and carrying a concealed weapon. Of much consequence, the report stated that in 1973 he had been convicted of possession of marijuana, given a two year probation, revoked 18 months later for an alleged violation. The conclusion of the report was:

*Prognosis for Probation:* The subject has been on probation prior to this offense. A previous presentence indicated a poor prognosis for probation. The subject did in fact avoid his probation obligations and did abscond supervision. He was violated on that probation and is currently appealing that violation. Due to the status of the subject's previous probation in conjunction with the questionable stability of his family life and the lack of full time employment, the prognosis for probation is considered very poor.

The inaccuracy of the report's account of the marijuana incident is twofold: (1) Warden not only had appealed from the order which held he had violated his probation, but his appeal was primarily from the underlying judgment of conviction. (2) He was not "currently appealing" anything at the time the report was prepared and submitted to the district judge for information and use in sentencing. Obviously the presentence investigation in assessing Warden's prognosis for probation as "very poor" relied heavily on the reported conviction for use of marijuana and Warden's reputed violation of the probation received in connection therewith. It is important that the record be set straight in that regard, as Warden could not help having been much prejudiced by the report, which prejudice in all likelihood continues to militate against him in his appeal.

By order of this Court in *State v. Warden*, No. 12243 (Dec. 8, 1976), Warden's marijuana conviction was reversed for insufficiency of the evidence.[2] A reversal of the underlying judgment of conviction rendered moot Warden's contention that he had not violated the probation he underwent in connection with that erroneous conviction. Nevertheless, it is of such significant importance that this Court should at least cursorily examine the record in Case No. 12243 to ascertain the extent to which Warden may have been improperly reported as a probation violator. I have done so.

Following the marijuana possession conviction of Warden, his brother Gary Warden, and four others, Warden was on June 14, 1974, granted a withheld judgment by District Judge Mosman and placed on probation for two years. One provision of that probation was that "in lieu of fine and costs," Warden pay into court $240, at the rate of $10 per month.[3] He was made subject to the rules and regulations of the Board of Correction and the district court. In November of 1975, the District Supervisor of the Board of Correction reported him as a violator. A warrant issued, and Warden was jailed.

As bearing on Warden's probationability, the record shows that Judge Schwam released him on his own recognizance. Judge Mosman assigned Judge Schwam to preside at the violation hearing.

Judge Schwam, then a magistrate, concluded that the state had shown a violation. Bearing again upon Warden's probationability, Judge Schwam upon revoking probation, entered a judgment of conviction, imposing a six months' jail sentence which he suspended, placing Warden on a six months' period of probation, requiring Warden to pay into court $150 at the rate of $25 monthly.

On appeal to district court from such magistrate disposition, Judge Mosman held a *de novo* violation hearing, and resentenced Warden. Warden this time was given an eight months' jail sentence which was not suspended. The appeal to this Court followed, where, as above set forth, the underlying conviction was reversed for insufficiency of evidence. The transcript of the hearing shows that Warden contended that probation beyond longer than a year was in excess of the court's jurisdiction, *State v. Eikelberger*, 71 Idaho 282, 230 P.2d 696 (1951), and by the time he was reported as a violator he had both paid the "fine" and completed one year's successful probation. Additionally, the record shows that Warden's alleged violations were the technical charge of failing to make a written monthly report to his probation officer, which was said to equal that he had "not responded to probation," and was "considered to have absconded supervision," which allegations or conclusions are somewhat on a par with those recently before this Court in *State v. Hayes*, 99 Idaho 713, 587 P.2d 1248 (1979), all of which strongly suggest that Warden's alleged probation violation might not have been upheld on appeal, had not it become a moot issue when the underlying conviction was reversed.

The more pertinent point coming out of a review of No. 12243, however, relative to Warden's sentencing in the case now at bench, is that in the marijuana case, Judge Schwam saw fit to release Warden on his own recognizance pending hearing, and after hearing suspended sentence and placed Warden on probation—certainly evidencing both his belief that the state had violated

2. Warden, his brother Gary, and four other persons had all been tried, and all but one convicted. Gary Warden was not placed on probation, but fined. His case having gone to final judgment, he appealed. The conviction was set aside on appeal, this Court holding that the verdict must be held to have been based on nothing but speculation. For the facts of the marijuana bust involving John W. Warden, the defendant here, see *State v. Warden*, 97 Idaho 752, 554 P.2d 684 (1976).

3. The record in No. 12243 shows that Warden had paid what he referred to as the "fine" when he was reported as a violator. His attorney contended at the revocation hearing that the probation period of two years impermissibly was longer than the maximum sentence which could have been imposed, one year.

Warden on technicalities, and that Warden could "do" a successful probation.

I submit that the presentence report was inaccurate and nondisclosing to the point where Warden was prejudiced.

B. Following the imposition of sentence Warden was immediately incarcerated in the penitentiary where he was destined to remain at least pending and until the outcome of his appeal to this Court.

The district court denied his request for admission to bail pending the appeal. Six months ago, under date of August 23, 1978, Warden moved this Court to set bail pending appeal. We did so, since which time Warden has been free, awaiting our decision. For my own part, the decision to admit Warden to bail was not based upon any premise that the district court was wrong in not having done so,[4] but solely on the strength of the showing Warden made in submitting his application. The motion was supported by the affidavits of his attorney, one with six attached statements, one by Dr. Dave Sanford, Administrator of the Security Medical Compound of the State Correctional Institution, one of Mr. Don Teeter, Assistant Chief of Operations of the same institution, one of Mr. Jim Irwin, correctional officer of that institution, one from Mr. Randall C. Miller, another correctional officer, one from yet another correctional officer, Mr. Randall Walker, and one from Mr. Wayne Valentine, the Food Administrator. That officials of the correctional institute would be inclined to say anything is significant in and of itself. As Mr. Walker states in his affidavit: "I don't usually write letters of this type, but for Mr. Warden I felt it appropriate due to the fact that he has not caused any trouble and that he is a very good worker."

Mr. Warden's attorney averred that Warden had several job opportunities awaiting him, and his wife and children had been on welfare since his incarceration, and that Warden if freed on bail would not flee because of his long ties with the State of Idaho. Rather than attempt to paraphrase the encouraging remarks of the other affiants, the same are set forth below in a note.[5]

It appears to me that the evaluation of Warden made by those directly in charge of

---

**4.** Warden by order of the district court was allowed to prosecute his appeal in pauperis, being unable to pay the costs of a reporter's transcript. The district court may have doubted Warden's ability to make bail, or more likely, in view of the presentence report may have thought him a poor risk. The district court should have stated reasons for denying admission to bail on appeal. *See State v. Iverson,* 76 Idaho 117, 278 P.2d 205 (1954) and *State v. Kerrigan,* 98 Idaho 701, 571 P.2d 762 (1977).

**5.** Dr. Sanford:

Mr. Wes Warden, inmate at Idaho State Correctional Institution, has been the cook in the Security Medical Compound for approximately one year. During that time, there has been little or no staff supervision and he has managed the kitchen efficiently and effectively. He has not represented any management problem and has been not only a model inmate but supportive to the Staff during his stay as cook at Security Medical.

While it is difficult to predict behavior on the outside from that which is observed while a person is incarcerated, I can say that I have observed nothing in his behavior or actions at this time that would contra-indicate his being considered for bond on the pending appeal.

Don Teeter:

Warden has worked in the I.S.M.F. as a cook since August 9, 1977. During that time, Warden has displayed an attitude toward his work, supervisor, and his confinement that is very commendable. Warden has put in a lot of hard working hours to insure the quality of his product is always outstanding. This is also attested to by the fact the V.I.P.s always eat in this dining room, through choice. I never pass up the chance to use Warden as an example of how a man can benefit himself even though incarcerated in the Idaho State Correctional Institution. Therefore, I do not hesitate to recommend all kinds of consideration for this man.

Jim Irwin:

This letter is in regard to Wes Warden # 15424. Inmate Warden came to this institution in January of 1977 with a 14-year sentence for Assault With Intent. Mr. Warden feels quite badly about his mistake as he is not a criminal, and does not commit criminal acts. Mr. Warden told the staff that he would not hurt anyone. However, an accident did occur, and he is truly sorry for his poor judgment.

Mr. Warden has been a model prisoner for approximately 18 months, and has never been a problem to us here in any way. He has been

him at the correctional institution is entitled to this Court's serious consideration in reviewing Warden's sentence. Hindsight, of course, gives 20–20 vision, and the district court in imposing upon Warden the maximum possible sentence did not have the benefit of the statements of those officials who would later be in charge of Warden. Admittedly this is an unusual set of circumstances,[6] but I can see nothing in the law or in logic which requires this Court to review Warden's sentence with eyes now closed to the very information which moved the Court to allow him freedom on bail pending appeal. To not do so will to some, I am certain, border on the unjust and inhumane.

Concluding, we see a record including a presentence report which was clearly erro-

neous and prejudicial to Warden. We see from the bail application which he has made in this Court a strong showing that Warden does in fact have good probation potential. At the same time we are asked to review a sentence, criticized as unduly harsh, which imposed upon Warden 14 years in the penitentiary, of which he has served, in commendable manner, almost two. For my part, if he is not to receive a new trial, I would reduce the sentence to 5 years. This same Court, though differently constituted, over twenty years ago *sua sponte* reduced a sentence, observing only "the meagerness of the testimony as to appellant's guilt." *State v. Constanzo,* 76 Idaho 19, 276 P.2d 959 (1954). Here, there is not only a limited amount of evidence, but the entire membership of the Court acknowledges that there was error in the trial. Other courts have

---

a willing worker, and has always been cooperative with staff. Staff feels that Mr. Warden should be given every consideration possible for early release, as this staff member feels that this man is not a criminal as such.

Randall C. Miller:

Inmate John Wesley Warden, 15424, entered the Idaho State Correctional Institution on the 19th day of January 1977 on an indeterminate sentence of fourteen (14) years for the crime of Assault with Intent.

Inmate Warden was assigned to the Idaho Security Medical Facility in August of 1977 and has since that time worked as 1st cook in the ISMF mess hall. During this period, inmate Warden has shown a degree of responsibility that is always sought but seldom found in any inmate.

The mess hall has consistently been rated as the best among the mess halls under the Board of Corrections, not only in cleanliness but in the preparation of food as well.

While it is true that Inmate Warden is at present confined at the Idaho State Correctional Institution, it is also true that among all the inmates presently incarcerated, Inmate Warden would have to be rated as one of the most responsible.

Thank you for any consideration on his behalf.

Randall Walker:

This letter is in reference to John W. Warden, # 15.424. Warden came to ISMF as a cook in August of 1977 and has continued in this capacity to the present date.

We haven't had one bit of trouble out of Mr. Warden and he has done a very fine job while he has been here. On his job he has access to knives and other cutlery items and yet there

has been no trouble from him or those he supervises.

Mr. Warden also has a very fine hobby doing leather work and he does a professional and exceptional job of it. He again has access to Class A tools and again there has been no problems.

To me, Warden just isn't the ordinary average type criminal. I have been a Correctional Officer for 5, almost 6 years, and to me he hasn't shown the usual criminal tendencies that the majority of the inmates project.

I don't usually write letters of this type, but for Mr. Warden I felt it appropriate due to the fact that he has not caused any trouble and that he is a very good worker.

Letter from Wayne Valentine

John W. Warden, 15424 has been under my supervision since January 1977.

During this period of time, I have made the following observations concerning this individual.

He has an exceptionally good attitude toward supervisors and fellow workers.

His work habits, cleanliness, and timeliness is very good.

His personal hygiene and appearance is far beyond average.

He has never caused or been involved in trouble of any kind during this period.

6. As is now well known throughout the state, like many other states, this Court functions with an ever increasing backlog of appeals waiting to be heard. Five years ago Warden's appeal would have been heard and disposed of within six months after he was incarcerated. Here almost two years elapsed before his appeal was heard.

**34**

reduced sentences where there was error, but not such as was deemed so prejudical as to merit a new trial.

If the Court declines to modify the sentence, at the very least the erroneous presentence report supplies sufficient ground for reversing the sentence which has been imposed. While the court below may determine to reimpose the identical sentence, it will at least be doing so with a full understanding of events transpiring in Case No. 12243 (No. CR 9901 in district court), and will have the hindsight advantage of the evaluation made of Warden in an on-the-field situation by *men in a position to really know* whereof they speak.